**Vertisteen EASTERLING**

v.

**CARDIAC PACEMAKERS, INC.**

**Civil Action No. 94–3832.**

United States District Court,
E.D. Louisiana.

Nov. 21, 1997.

Robert Murray Johnston, Adams, Johnston & Oreck, New Orleans, LA, Ronald J. Favre, Michael Hingle & Associates, Inc., Hammond, LA, Waldon Michael Hingle, Michael Hingle & Associates, Inc., New Orleans, LA, for Plaintiff.

Charles L. Chassaignac, Mary Laura Meyer, Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., New Orleans, LA, Timothy Allen Pratt, Michael Lee Short, Shook, Hardy & Bacon, Kansas City, MO, Duncan S. Kemp, III, Law Firm of Duncan S. Kemp, III, Hammond, LA, for Defendant.

### *ORDER AND REASONS GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

VANCE, District Judge.

Plaintiff Easterling commenced this action on February 23, 1994, in the 21st Judicial District Court in Tangipahoa Parish, Louisi-

ana. Defendant Cardiac Pacemakers, Inc. ("CPI") timely removed the case to this Court and subsequently filed a motion for summary judgment asserting that all of Easterling's state law claims were preempted by the Medical Device Amendments of 1976 (the "MDA"), codified at 21 U.S.C. § 360c, *et seq.* On December 28, 1995, this Court granted CPI's motion for summary judgment on the grounds that all of plaintiff's claims were preempted under applicable Fifth Circuit case law. Plaintiff timely appealed this Court's decision to the Court of Appeals for the Fifth Circuit.

On April 10, 1997, the Fifth Circuit vacated the judgment of this Court and remanded the case for further consideration in light of the Supreme Court's decision in *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). By minute entry dated May 7, 1997, this Court ordered the parties to submit briefs addressing the effect of the *Medtronic* decision on this case. The Court now reconsiders CPI's motion for summary judgment.

## I. FACTUAL BACKGROUND

In April of 1991, Ms. Easterling was implanted with a cardiac defibrillator, the Ventak AICD Model 1550, manufactured and distributed by CPI. Ms. Easterling alleges that on or about April 15, 1993, the defibrillator malfunctioned, allegedly shocking and electrocuting her. Pet. ¶ VIII–IX. Ms. Easterling alleges that she suffered a cerebral hemorrhage, or stroke, allegedly caused by the malfunctioning defibrillator. *Id.* ¶ XI. The device was deactivated but remained implanted. Ms. Easterling alleges that she is totally incapacitated and disabled as a result of her stroke. *Id.*

As previously recounted by this Court, Ms. Easterling alleges in her complaint that CPI's negligence consisted of the following acts and omissions:

(b) failure to properly monitor and/or inspect the cardiac pacemaker;

(d) failure to advise claimant of the possible danger of shock and/or electrocution;

(e) failure to discover the defect/dangerous condition of the automatic defibrillator;

(f) failure to properly design the automatic implantable defibrillator;

(g) defective manufacturing of the automatic implantable defibrillator;

(h) use of the improper and/or defective materials in the manufacture of the automatic implantable defibrillator;

(i) failure to warn patients of the defects in automatic implantable defibrillators;

(k) failure to properly inspect the automatic implantable defibrillator for defects;

(*l* ) failure to properly test the automatic implantable defibrillator to ensure that it was adequate and safe in construction and/or design;

(m) distributing the automatic implantable defibrillator it knew or should have known was defective;

(n) retailing the automatic implantable defibrillator it knew or should have known was defective;

(o) failure to warn the recipients of the defect/dangerous condition of the automatic implantable defibrillator;

(p) failure to properly assemble the automatic implantable defibrillator;

(q) other negligence which may be proven at trial of this matter.

*Id.* ¶ XIII. In short, Ms. Easterling's complaint is based on claims of negligence and strict liability for failure to warn and for defective design, construction, and manufacture of the defibrillator. In her original opposition brief to CPI's motion for summary judgment, Ms. Easterling also raised claims of (1) negligence, based upon CPI's failure to adhere to FDA regulations; (2) fraud, based on advertising or promotion of the product; and (3) contract liability for breach of express warranties.[1]

---

1. In its prior order, this Court dismissed plaintiff's claims based on fraud and contract liability for reasons unaffected by the Supreme Court's decision in *Medtronic.* The Court's prior holding on these claims thus remains unchanged. *See* Order at 11–12.

## II. DISCUSSION

### A. The Medical Device Amendments of 1976 ("MDA")

The MDA classifies medical devices in three categories based on the risk they pose to the public. *See* 21 U.S.C. § 360c(a)(1). The device at issue here, CPI's Ventak AICD Model 1550 cardiac pacemaker ("Model 1550") is a Class III device, because it either "presents a potential unreasonable risk of illness or injury," or is "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health." 21 U.S.C. § 360c(a)(1)(C).

Before a Class III device may be introduced to the market, the manufacturers must provide the Food and Drug Administration (the "FDA") with a "reasonable assurance" that the device is both safe and effective. *See* 21 U.S.C. § 360e(d)(2). To provide that assurance, a manufacturer must obtain pre-market approval ("PMA") from the FDA. The process is a "rigorous one" and requires the manufacturers to "submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, ——, 116 S.Ct. 2240, 2247, 135 L.Ed.2d 700 (1996). Manufacturers must provide the FDA with samples of the device, an outline of the device's components and properties, a description of the manufacturing process, copies of the proposed labels, various other data and information, and any other information the FDA requests. 21 C.F.R. § 814.20.

There are two exceptions to the PMA requirement. First, the MDA grandfathers in pre–1976 devices and allows these products to remain on the market without FDA approval until the FDA initiates and completes the PMA process. *See* 21 U.S.C. § 360e(b)(1)(A); 21 C.F .R. § 814.1(c)(1). Second, devices that are "substantially equivalent" to grandfathered products are also exempt from the PMA process. *See* 21 U.S.C. § 360e(b)(1)(B). The parties in this case do not dispute that the device at issue here—Model 1550—does not fall within .either of these exceptions, and it was subject to the more rigorous PMA process.

### B. Preemption and *Medtronic, Inc. v. Lohr*

Central to the dispute in this case is the extent to which the MDA preempts state tort claims. The MDA provides:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> > (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> >
> > (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

The Supreme Court examined the preemptive scope of the MDA in *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). In that case, Lora Lohr filed a complaint against Medtronic, Inc. in state court, alleging state law claims of negligence and strict liability, based on the alleged failure of her pacemaker to function properly. Specifically, plaintiff alleged claims for defective design, manufacturing, and labeling, as well as a claim based on the violation of FDA regulations. After removing the case to federal district court, Medtronic moved for, and the district court granted, summary judgment on the grounds that the MDA preempted all of Lohr's state law claims. The Eleventh Circuit Court of Appeals affirmed the dismissal of Lohr's negligent manufacturing and failure to warn claims, but the appellate court concluded that Lohr's negligent design claims were not preempted. The Supreme Court—in a plurality decision with three opinions—found that the MDA did not preempt any of Lohr's common law claims, and the case was remanded for further proceedings.

A majority of the Court recognized that the language used in the MDA expressly preempts state law. *Medtronic,* 518 U.S. at ——, 116 S.Ct. at 2250. The Court was

strongly divided, however, as to the extent to which state law was preempted. *See Reeves v. AcroMed Corp.,* 103 F.3d 442, 446 (5th Cir.1997) (explaining that "the Court concluded that the domain expressly pre-empted by that language must be identified"). This Court now addresses that issue.

### 1. The MDA *can* preempt a state common law cause of action.

The Supreme Court disagreed over whether the MDA could ever preempt a state common law cause of action. Justice Stevens, in an opinion joined by Justices Kennedy, Souter, and Ginsburg, concluded that a common law cause of action was not a "requirement" under the MDA's preemption provision, because the use of the term "requirement" suggests a focus on "device-specific enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries." *Medtronic,* 518 U.S. at ——, 116 S.Ct. at 2252. Justice O'Connor, in an opinion joined by Justices Rehnquist, Scalia, and Thomas, disagreed, concluding that the MDA preempts state common law claims "to the extent that their recognition would impose 'any requirement' different from, or in addition to, FDCA requirements applicable to the device." *Id.* at ——, 116 S.Ct. at 2263. Justice Breyer provided the decisive vote on this issue, indicating his agreement with Justice O'Connor. He wrote that the MDA could preempt a state requirement "that takes the form of a standard of care or behavior imposed by a state-law tort action." *Id.* at ——, 116 S.Ct. at 2260. Thus, a majority of the Court found that a state common law cause of action may constitute a state "requirement," and the MDA may sometimes preempt that "requirement."

### 2. The MDA preempts a state common law cause of action when it is different from, or in addition to, a device-specific federal requirement.

Although Justice O'Connor concluded that a common law cause of action is preempted by the MDA anytime it would impose a requirement different from or in addition to a general federal requirement, a majority of the Court disagreed. Relying in large part on the FDA's own regulations, a majority of the Court focused on the need for specificity. *Id.* at 518 U.S. at —— & n. 18, 116 S.Ct. at 2257 & n. 18; *id.* at —— – ——, 116 S.Ct. at 2260–61 (Breyer, J., concurring). The FDA regulations provide:

> State or local regulations are preempted only when the Food and Drug Administration has established specific counterpart regulations or *there are other specific requirements applicable to a particular device under the act,* thereby making any existing divergent State or local requirement applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not 'requirements applicable to a device' within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:
>
> (1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g. requirements such as general electric codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.
>
> (2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.

21 C.F.R. § 808.1(d)(1)-(2) (1996) (emphasis added).

The Court stated that it "did not believe that this statutory and regulatory language necessarily precludes 'general' federal requirements from ever pre-empting state requirements, or 'general' state requirements from ever being pre-empted." *Medtronic,* 518 U.S. at ——, 116 S.Ct. at 2257. The Court did, however, set forth certain criteria for preemption. To be preempted, the state "requirements" must be "with respect to" medical devices. *Id.* Moreover, "state requirements of 'general applicability' are not preempted except when they have 'the effect

of establishing a substantive requirement for a specific device.'" *Id.* Finally, federal requirements will preempt state law "only if they are 'specific counterpart regulations' or 'specific' to a 'particular device.'" *Id.* The Court concluded that a "careful comparison" between the state and federal requirements is necessary "to determine whether they fall within the intended pre-emptive scope of the statute and regulations." *Id.* at ———–———, 116 S.Ct. at 2257–58.

Echoing the regulatory statement in 21 C.F.R. § 808.1(d)(2), the Court unanimously concluded that a state common law action is not preempted if it imposes duties that mirror the FDA regulations. In other words, if the state law cause of action seeks to enforce a requirement that is already imposed by the FDA, it is not "different from, or in addition to" requirements under federal law, and it is therefore not preempted. As the Court explained, nothing in the statute denies the state "the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* 518 U.S. at ———, 116 S.Ct. at 2255; *see also id.* at ———, 116 S.Ct. at 2262 (O'Connor, J., concurring in part and dissenting in part). A damages remedy does not amount to an additional or a different requirement, "it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law." *Id.* at ———, 116 S.Ct. at 2255.

A majority of the Supreme Court ultimately concluded that each of the Lohrs' claims survived the preemption analysis. Important to the Court's analysis was the nature of the federal requirements imposed upon Medtronic's device. The medical device at issue in *Medtronic*—Medtronic's Model 4011 pacemaker ("Model 4011")—was found by the FDA to be "substantially equivalent" to devices introduced prior to the enactment of the MDA. Medtronic was advised by the FDA that it could market its device subject only to the general control provisions of the MDA and not the more rigorous PMA process. *See id.* 518 U.S. at ———, 116 S.Ct. at 2248. The "substantial equivalence" process "did not 'require' Medtronics' pacemaker to take any particular form for any particular

reason ...." *See id.* at ———, 116 S.Ct. at 2254. Rather, the "substantial equivalence" provision was intended to maintain the status quo with respect to the marketing of existing medical devices and their substantial equivalents. *See id.* at ———, 116 S.Ct. at 2255. The Supreme Court stated "[t]hat status quo included the possibility that the manufacturer of the device would have to defend itself against a state-law claim of negligent design." *Id.*

With respect to the Lohrs' manufacturing and labeling claims, preemption was not warranted because of the generality of the federal labeling and manufacturing requirements. "[T]he federal requirements reflect important but entirely generic concerns about device regulation generally, not the sort of concerns regarding a specific device or field of device regulation which the statute or regulations were designed to protect from potentially contradictory state requirements." *Id.* at ———, 116 S.Ct. at 2258. Additionally, the Court noted that the state common-law "requirements" were merely the general duty to use due care and inform users of the risks involved in the use of a product; such general requirements "were not specifically developed 'with respect to' medical devices." *Id.* Finally, the Court held that any state claims premised on a violation of FDA regulations survives the preemption attack: "[n]othing in § 360k denies [the state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* at ———, 116 S.Ct. at 2254.

## C. Preemption Post-*Medtronic*

Since *Medtronic*, the courts that have addressed this issue have distinguished devices that are subject to the rigorous PMA process from those subject to the more lenient "substantial equivalent" process. In the latter group of cases, the courts rely almost exclusively on *Medtronic* and conclude that the state common law claims are not preempted because the device at issue was never reviewed under the MDA for safety or efficacy, and the FDA never required the device to take any particular form. *See, e.g., Reeves v. AcroMed Corp.,* 103 F.3d 442, 447–48 (5th

Cir.1997); *Duvall v. Bristol–Myers–Squibb Co.*, 103 F.3d 324, 330 (4th Cir.1996). In cases in which the device was subject to the PMA process, however, the holding from *Medtronic* is not directly transferable.

As the Court of Appeals for the Seventh Circuit recently noted, "the holding in *Medtronic* contains several ambiguities that impair our ability to perceive with absolute clarity the path that the Court has chosen for us to follow." *Mitchell v. Collagen Corp.*, 126 F.3d 902, 910 (7th Cir.1997). First, the plurality opinion authored by Justice Stevens states that the statutory and regulatory language does not preclude "general" state requirements from ever being preempted. However, in reaching its "no preemption" conclusion, the Court heavily relied on the state claims' lack of specificity. This aspect of the decision suggests that state common-law claims will not be preempted because, as the Court stated, "their generality leaves them outside the category of requirements that § 360k envisioned to be 'with respect to' specific devices." *Medtronic*, 518 U.S. at ——, 116 S.Ct. at 2258. The quoted statement, and Justice Stevens' reliance on the general nature of state law claims, contradicts Justice Breyer's separate concurring opinion, which downplayed the generality of the state requirements and, instead, highlighted the nature of the FDA requirements in that case. *Id.* at —— – ——, 116 S.Ct. at 2259–61. Indeed, Justice Breyer explicitly stated that the MDA could preempt a requirement "that takes the form of a standard of care or behavior imposed by a state-law tort action." *Id.* at ——, 116 S.Ct. at 2260. As the Seventh Circuit indicated in *Mitchell*, Justice Stevens' emphasis on the lack of specificity of state claims is at odds with the conclusion by a majority of the Court that common law claims are preempted to the extent that they would impose requirements different from or in addition to any requirements set out by the FDA with respect to the specific device. *Mitchell*, 126 F.3d at 910; *see Medtronic*, 518 U.S. at ——, 116 S.Ct. at 2263 (O,Connor, J., concurring in part and dissenting in part); *id.* at —— – ——, 116 S.Ct. at 2259–60 (Breyer, J., con-

curring in part and concurring in the judgment).

To resolve these ambiguities, it is important to note that the conclusion reached in *Medtronic*—*i.e.*, that the state claims are not preempted—was dependent on two factors: (1) the lack of device-specific state requirements, and (2) the absence of specific federal requirements applicable to Medtronic's device. Indeed, one reason that Justice Breyer ultimately concurred with Justice Stevens was the absence of any specific federal requirements imposed upon the device at issue. *See id.* at ——, 116 S.Ct. at 2261 ("Insofar as there are any applicable FDA requirements here, those requirements, even if numerous, are not 'specific' in any relevant sense. Hence ... the FDA does not intend those requirements to preempt the state requirements at issue here.").

■ To give meaning to the Court's statement that "general" state requirements are not precluded from ever being preempted, and to adhere to a majority of the Court's conclusions, this Court holds, as other courts have recognized, that state claims—even those based upon a general duty of care—are preempted if they have the effect of imposing requirements on the device that are different from, or in addition to, a federal requirement that is imposed upon the specific device. *See Mitchell*, 126 F.3d at 911–12 (*citing* several state cases); *Papike v. Tambrands, Inc.*, 107 F.3d 737, 741 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 166, 139 L.Ed.2d 110 (1997) (explaining that state common-law claims are preempted "to the extent that their recognition would impose any requirements different from, or in addition to, FDA requirements applicable to the device"); *Martin v. Telectronics Pacing Systems, Inc.*, 105 F.3d 1090, 1099 (6th Cir.1997) (holding that general state statute was preempted because "it is the kind of requirement that would impede the implementation and enforcement of specific federal requirements"), *pet. for cert. filed*, 65 USLW 3755 (May 1, 1997); *Chmielewski v. Stryker Sales Corp.*, 966 F.Supp. 839, 843 (D.Minn.1997)("Preemption thus depends on whether application of the common law would impose requirements different from device-specific federal

requirements, not whether the claims themselves are general or specific."); *Fry v. Allergan Medical Optics*, 695 A.2d 511, 517 (R.I.), *cert. denied*, —— U.S. ——, 118 S.Ct. 374, 139 L.Ed.2d 291 (1997) ("[W]e conclude that plaintiff's state law claims amount to the imposition of additions to federal requirements under the MDA because those claims would impose different or additional duties upon the defendant in the form of a court judgment.").

### D. Preemption Analysis

Under the preemption analysis set forth *supra*, the Court must ask two questions: (1) Is the medical device subject to a device-specific federal requirement? and (2) Would the application of the state "requirement" impose standards that are different from, or in addition to, the device-specific federal requirements?

#### 1. Federal Requirements

In this case, it is undisputed that the device was subject to the PMA approval process. The Fifth Circuit has held that the PMA process constitutes a specific requirement applicable to a particular device under the MDA. *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1422 & n. 3, 1424 n. 8 (5th Cir. 1993). Further, courts since *Medtronic* have concluded that the PMA process constitutes a specific federal regulation of the product. *See Mitchell*, 126 F.3d at 911; *Fry*, 695 A.2d at 516; *Steele v. Collagen Corp.*, 54 Cal. App.4th 1474, 63 Cal.Rptr.2d 879 (1997). As the Seventh Circuit stated:

> During the PMA process, the federal government, it can truly be said, has "'weighed the competing interests relevant to the particular requirement in question,

reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers.'"

*Mitchell*, 126 F.3d at 911 (*quoting Papike*, 107 F.3d at 741 (*quoting Medtronic*, 518 U.S. at ——, 116 S.Ct. at 2258)).

As mentioned *supra*, the PMA process requires the manufacturers to provide the FDA with samples of the device, an outline of the device's components and properties, a description of the manufacturing process, copies of the proposed labels, various other data and information, and any other information the FDA requests. 21 C.F.R. § 814.20. Here, the Model 1550 [2] has been scrutinized by the FDA since 1985.[3] For the past number of years, CPI has submitted a series of PMA Supplements to the FDA concerning changes to the Model 1550.[4] Each supplement was approved by the FDA, subject to the conditions described in the "Conditions of Approval." That form specifies that "[b]efore making any changes that could affect the safety or effectiveness of the device, [the applicant must] submit a PMA supplement for review and approval by [the] Center for Devices and Radiological Health (CDRH) [of the FDA]." *See, e.g.*, Def.'s Supplemental Mem., Exh. B. Further, the form instructs that changes that must be submitted to the CDRH include, but are not limited to:

(1) new indications for use;

(2) labeling changes;

(3) changes in existing manufacturing facilities, methods, or quality control procedures;

---

**2.** According to Cardiac Pacemaker, it obtained approval from the FDA for PMA No. P830060, a model from which Model 1550 evolved. *See* Aff. Nicholas J. Horvath, Exh. 1, ¶ 3.

**3.** The Court notes that plaintiff has objected on the record to defendant's submission of evidence in support of its supplemental memorandum. The Court accepts defendant's evidence in the record for the limited purpose of establishing that the PMA process imposed certain requirements upon the Model 1550. To the extent that

defendant's rely on this evidence to establish that Cardiac Pacemaker has not violated any FDA-imposed regulation, the Court responds *infra*, section II.D.2.

**4.** A "PMA Supplement" is "a supplemental application to an approved PMA for approval of a change or modification in a Class III medical device, including all information submitted with or incorporated by reference herein." 21 C.F.R. § 814.3(g).

(4) the use of a different facility or establishment to manufacture, process, or package the device;

(5) changes in sterilization procedures;

(6) changes in packaging;

(7) changes in the performance of design specifications, circuits, parts, components, accessories, ingredients, or physical layout of the device; and

(8) extension of the expiration date of the device based on data obtained under a new or revised testing protocol that has not been approved by the CDRH.

*Id.*

■ Although the FDA's requirements are generic in the sense that the "Conditions for Approval" are imposed upon each device subject to the PMA process, the FDA's affirmative approval of the device and its subsequent modifications constitute device-specific requirements. *See Mitchell,* 126 F.3d at 913 ("Approval by the FDA constitutes approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling. The FDA's determination is specific to the product."). In other words, once the FDA approves a specific design, that design becomes in effect the FDA requirement.

The Court notes that obtaining FDA-approval through the PMA process is not a routine matter: as noted *supra,* the FDA spends an average of 1,200 hours reviewing each device. Moreover, as the Supreme Court recognized, the PMA process is significantly different from the "substantial equivalent" inquiry under § 510(k). That process merely requires the device to be "substantially equivalent" to a pre-existing device; the FDA does not require those devices "to take any particular form for any particular reason." *Medtronic,* 518 U.S. at ——, 116 S.Ct. at 2254. The PMA process reflects the government's careful consideration of the risks and benefits of the device, and the FDA's approval of a device constitutes a set of federal requirements that are imposed upon the specific device in order to render the device safe and effective. As the Seventh Circuit stated in *Mitchell,* FDA approval "constitutes approval of the product's design, testing, intended use, manufacturing meth-

ods, performance standards and labeling." *Mitchell,* 126 F.3d at 912.

## 2. Plaintiff's Claims

As reiterated *supra,* Ms. Easterling's complaint is based on claims of negligence and strict liability under Louisiana law for failure to warn and defective design, construction, and manufacture of the defibrillator. Plaintiff's claims arise under the Louisiana Products Liability Act, La. R.S. 9:2800.51–2800.59 ("LPLA"), which establishes the exclusive theories of liability for manufacturers for damage caused by their products. Under the Act, "[a] product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. R.S. 9:2800.55. A second ground for liability is that the product is unreasonably dangerous in design: the plaintiff must establish that, at the time the product left its manufacturer's control, "(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." La. R.S. 9:2800.56. Further, a manufacturer may be liable for failure to warn only if the plaintiff proves that "the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. R.S. 9:2800.57.

■ Under the analysis set forth by this Court, all of these claims must be considered preempted to the extent that they assert that Cardiac Pacemaker was negligent or strictly liable despite its adherence to the standards set forth by the FDA in its PMA for this specific device concerning its design, testing,

intended use, manufacturing methods, performance standards and labeling. As the Seventh Circuit stated, "[a] state court judgment premised on a determination that such a specific allegation [of negligence despite adherence to FDA required standards] is true would necessarily conflict with the determination of the FDA that its requirements rendered the product safe and effective." *Mitchell,* 126 F.3d at 913. This point was also aptly illustrated by the example given by Justice Breyer in his concurring opinion in *Medtronic,* 518 U.S. at ——, 116 S.Ct. at 2259–60 (illustrating that a MDA regulation would preempt "a state law tort action that premises liability upon the defendant manufacturer's failure to use a 1–inch wire" when MDA regulation required a 2–inch wire). A state court judgment that sets the standard of care at a level higher than what the FDA requires would necessarily constitute a requirement "different from, or in addition to" the requirements established through the PMA process.

The only claims that may survive preemption here are claims based on Cardiac Pacemaker's failure to adhere to the standards set forth by the FDA in the PMA. *Accord, Mitchell,* 126 F.3d at 913 ("[T]o the degree these claims may be read to allege that *Collagen* failed to meet the standards set forth in the PMA process, the allegations are not preempted."). As stated *supra,* the Supreme Court unanimously concluded that a state cause of action is not preempted if it imposes duties that mirror the FDA regulations.

■ Defendants assert that plaintiff has not pled such claims and that the Louisiana Products Liability Act would not recognize them if she did. It is true that the complaint does not specifically refer to violations of FDA or PMA standards, although, since 1995, plaintiff's briefs have generally assert-

ed violations of FDA regulations by adulteration and misbranding. In addition, plaintiff produced two recall notices from the FDA on Model 1550 stating that it was adulterated or misbranded.[5] As to plaintiff's "adulteration" claim, the complaint does allege that the device was defectively manufactured and that it was manufactured with improper or defective materials. As noted, the LPLA provides a cause of action if a product is unreasonably dangerous in construction or composition because of deviations from the manufacturer's specifications or performance standards. The LPLA would provide a cause of action if a product were unreasonably dangerous because it was not manufactured in accordance with the manufacturer's specifications and performance standards that had been approved by the FDA in the PMA process. The allegations of defective manufacture in the complaint are sufficient to raise a claim under the LPLA, but plaintiff's claim can only be based on deviations from manufacturing specifications and standards approved in the PMA process. To this extent, the Court denies defendant's motion for summary judgment as to the manufacturing claim.

■ As to plaintiff's assertion of a "misbranding" claim, the Court finds that (1) a claim based on violation of PMA labeling standards would not be preempted; (2) the LPLA provides a cause of action for failure to warn; (3) plaintiff has pled a failure to warn claim; and (4) plaintiff claims in her brief that the device was misbranded in violation of FDA regulations. However, what is not set forth is the nature and source of the federal labeling requirements, and how they were violated, such as whether certain warnings were required and not given. The Court therefore cannot determine whether the misbranding allegedly at issue raises a

---

5. The Code of Federal Regulations directly addresses claims of this nature:

Generally, section 521(a) does not preempt a State or local requirement prohibiting the manufacturer of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, then the prohibition will be preempted if the requirement is different from,

or in addition to, a Federal requirement established under the act. In determining whether such a requirement is preempted, the determinative factor is how the requirement is interpreted and enforced by the State or local government and not the literal language of the statute, which may be identical to a provision in the act.

21 C.F.R. § 808.1(d)(6)(ii) (1996).

claim under the LPLA and, if so, whether a failure to warn claim based on the type of misbranding at issue would impermissibly constitute labeling requirements different from or in addition to those imposed by the PMA regime. The parties are directed to brief these issues to specify (1) the PMA/FDA labeling requirements that apply to this device; (2) whether and how they were violated; (3) whether the alleged violation is actionable under the LPLA as a failure to warn; and (4) if so, whether recognition of such a claim would impermissibly constitute a requirement different from or in addition to the FDA-approved labeling. Plaintiff shall file her brief within seven days of this order, and defendant shall respond seven days thereafter.

Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is granted as to all negligence and strict liability claims except an LPLA claim based on failure to manufacture the product in accordance with manufacturing specifications and standards approved in the PMA process. The Court reserves judgment on the failure to warn claim pending rebriefing of the issues delineated above.