**Janice RICHMAN, Plaintiff,**

v.

**W.L. GORE & ASSOCIATES, INC., Defendant.**

**No. 94 Civ. 6397(PKL).**

United States District Court,
S.D. New York.

Dec. 30, 1997.

Mirman, Markovits & Landau, P.C. (Ephrem Wertenteil, of counsel), New York City, for Plaintiff.

Hughes Hubbard & Reed (Daniel H. Weiner, of counsel), New York City, Neal Gerber & Eisenberg (John N. Scholnick, of counsel), Chicago, IL, for Defendant.

## OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Janice Richman moves the Court for an order, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure and the Court's inherent authority, modifying and revising the Court's Opinion and Order of March 24, 1995 (the "March 1995 Opinion").[1] For the reasons stated below, the motion is denied in part and granted in part.

## BACKGROUND

This is a product liability action against W.L. Gore & Associates, Inc. ("Gore"). Plaintiff seeks recovery for injuries allegedly resulting from an artificial ligament (the "Ligament") purportedly manufactured by Gore. Richman claims that prior to April, 1992, the Ligament was surgically implanted in her body and that she suffered internal and external injuries due to the failure of the Ligament. Specifically, Richman asserts that the Ligament shredded and disintegrated, causing foreign body reactions, severe allergic reactions, and extreme pain and suffering, as well as accelerating the deterioration of the joint held together by the Ligament. The Ligament that is at issue in the instant action is the Gore–Tex Cruciate Ligament. The Ligament was a medical device regulated by the United States Food and Drug Administration (the "FDA"), as a Class III device. As a Class III device, the FDA had to approve the Ligament for marketing.

On October 10, 1986, the FDA announced its approval of Gore's premarket approval application for the Ligament. Gore asserts that it has complied with all FDA regulations and all conditions of the approval, and that the FDA has never acted to obtain either a voluntary or involuntary withdrawal of the premarket approval for the Ligament. On May 21, 1993, Gore sent a letter to the FDA withdrawing the premarket approval for the Ligament, effective July 15, 1994.

In June, 1994, plaintiff commenced the instant action in the Supreme Court of the State of New York. Gore then removed the action to this Court, pursuant to 28 United States Code ("U.S.C.") § 2241. On March 24,

---

1. Plaintiff also brings this motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, seeking vacatur of the opinion. However, the March 1995 opinion did not result in the entry of a final judgment. Therefore, a motion under Rule 60 is inappropriate, as Rule 60(b) applies only to "a final judgment, order, or proceeding." Fed.R.Civ.P. 60(b); see also Fennell v. TLB Kent Co., 865 F.2d 498, 501 (2d Cir.1989).

1995, this Court granted summary judgment to Gore and dismissed with prejudice plaintiff's claims of negligence, strict liability, and breaches of implied warranties, because the Medical Device Amendments ("MDA"), 21 U.S.C. §§ 360c et seq., of the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 et seq., preempted the plaintiff's state law claims. The Court also dismissed Richman's claim for breach of express warranty for failure to state a claim upon which relief could be granted. This claim was not preempted by federal law, but plaintiff had failed to plead the cause of action properly. Therefore, the Court dismissed this claim without prejudice.

The history of this case from March 24, 1995, to the present is tortured and confusing. Following the March 1995 Opinion, plaintiff sought to appeal to the United States Court of Appeals for the Second Circuit. However, as the March 1995 Opinion was not a final judgment in the case, the Second Circuit Staff Counsel advised plaintiff that her appeal was premature. Plaintiff waited until August 4, 1996, to withdraw her appeal, but plaintiff soon thereafter filed a substantially identical appeal. Then, on October 10, 1996, plaintiff moved this Court to vacate the March 1995 Opinion, pursuant to Fed.R.Civ.P. 60(b), on the basis of the decision of the United States Supreme Court in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Plaintiff contends that the holding in *Medtronic* is a change in the controlling case law and mandates vacatur of the March 1995 Opinion. On January 15, 1997, this Court "so ordered" a stipulation signed by the parties dismissing with prejudice plaintiff's claim of breach of express warranty. Plaintiff then asked the Court to consider its motion as one made pursuant to Fed.R.Civ.P. 54(b), as well. Finally, on April 15, 1997, plaintiff officially withdrew her second appeal in the Second Circuit, allowing this Court to decide the motion presented in October, 1996.

**2.** Fed.R.Civ.P. 54(b) provides in relevant part that: "[A]ny order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the

## DISCUSSION

### I. *Standard for Granting a Motion Under Rule 54(b)*

█ The Court has authority under Fed. R.Civ.P. 54(b),[2] as well as the inherent power of the court, to reconsider a prior decision at any time before the entry of final judgment. *See Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131, 134–35 (2d Cir.1956) (Hand, L., J.). In this District, Local Rule 6.3 (formerly Local Rule 3(j)) requires a party to submit a motion to reconsider a decision within ten days of the docketing of the Court's original determination, unless the movant presents a compelling reason to ignore the time limit. *See Baden v. Koch*, 799 F.2d 825, 828 (2d Cir.1986). Richman obviously did not submit this motion to the Court within ten days of the March 1995 Opinion, so plaintiff must offer a compelling reason in order for the Court to reconsider its ruling.

The major grounds that justify a reconsideration involve an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or to prevent manifest injustice. *See* Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction § 4478; *see also Berish v. Richards Medical Co.*, 937 F.Supp. 181, 182–83 (N.D.N.Y.1996). Plaintiff argues that the Supreme Court's decision in *Medtronic* constitutes an intervening change in controlling law and mandates a revision of the March 1995 Opinion. This Court examines *Medtronic* to determine what effect, if any, that decision has on the law to be applied in this case.

### II. *Medtronic, Inc. v. Lohr*

*Medtronic* presented the Supreme Court with the question of whether the MDA preempts state common law actions against the manufacturer of an allegedly defective medical device. The MDA classifies medical devices into one of three categories based on the potential risk that each poses to the

action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment...."

public. Class I devices present the least risk of harm and are the most loosely regulated, Class II devices are more heavily regulated, and Class III devices are the most heavily regulated. 21 U.S.C. §§ 360c(a)(1)(A), (B), and (C). The Ligament, as well as the pacemaker at issue in the *Medtronic* case, is a Class III device.

In order to market a Class III device, a manufacturer must provide the Food and Drug Administration ("FDA") with a "reasonable assurance" that the device is both safe and effective. 21 U.S.C. § 360e(d)(2). To provide this reasonable assurance, a manufacturer must obtain premarket approval ("PMA") by submitting detailed information about the safety and effectiveness of the device. *See Medtronic*, 518 U.S. at —— ——, 116 S.Ct. at 2246–47. The PMA process is long and rigorous, with the FDA spending approximately 1200 hours reviewing each application. *See id.* at ——, 116 S.Ct. at 2246.

There do exist exceptions to the PMA requirements for Class III devices. The MDA allows devices marketed before 1976 (when Congress enacted the MDA) to remain on the market until such time as the FDA initiates and completes the PMA. *See* 21 U.S.C. § 360e(b)(1)(A); *see also* 21 C.F.R. § 814.1(c)(1). The MDA also permits devices that are "substantially equivalent" to pre–1976 devices to avoid the PMA process. *See* 21 U.S.C. § 360e(b)(1)(B). Finally, the MDA exempts investigational devices from the PMA process in order "to encourage, to the extent consistent with the protection of public health and safety and with ethical standards, the discovery and development of useful devices intended for human use." 21 U.S.C. § 360j(g). This exemption is called the "Investigational Device Exemption" ("IDE").

Manufacturers of "substantially equivalent" Class III devices are subject to a limited form of review. This review is known as "premarket notification" or the "§ 510(k) process", and requires each manufacturer to submit limited information about the device to the FDA. If the FDA determines that the device is "substantially equivalent" to a preexisting device, it can be marketed with-

out further regulatory analysis. *See Medtronic* at ——, 116 S.Ct. at 2247. This review is not comparable to the PMA process. While the FDA spends 1200 hours reviewing a device submitted for PMA, it spends only approximately 20 hours on each § 510(k) review. *See id.*

Gore subjected the Ligament to the PMA process, and only placed the device on the market following rigorous screening by the FDA. The pacemaker at issue in *Medtronic*, conversely, entered the marketplace as a Class III device "substantially equivalent" to a preexisting device. The factual background of *Medtronic* is therefore vastly different than that of the instant case, although the same statute and regulation are at issue in both cases.

The MDA provides:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The pertinent FDA regulation provides:

> State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements.

21 C.F.R. § 808.1(d).

*Medtronic* involved claims by a plaintiff resulting from injuries allegedly sustained due to a defective pacemaker manufactured by Medtronic. The case originated in the Eleventh Circuit, and the plaintiff alleged claims for defective design, manufacturing, and labeling, as well as a claim based on the

violation of FDA regulations. The district court granted summary judgment on the grounds that the MDA preempted all of Lohr's claims. The United States Court of Appeals for the Eleventh Circuit affirmed the dismissal of the negligent manufacturing and failure to warn claims, but the court concluded that the MDA did not preempt the negligent design claims. The Supreme Court, in a plurality decision with three opinions, found that the MDA did not preempt any of the claims.

While a majority of the Court recognized that the language of the MDA preempts state law, the Court was sharply divided as to the extent of this preemption. In the principal opinion, Justice Stevens, joined by Justices Kennedy, Souter, and Ginsburg, concluded that a common law cause of action was not a "requirement" under the MDA's preemption provision, because the use of the term "requirement" suggests a focus on "device-specific enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries." *Medtronic* at ——, 116 S.Ct. at 2252. Justice O'Connor, in an opinion joined by Justices Rehnquist, Scalia, and Thomas, concluded that the MDA preempts state common law claims "to the extent that their recognition would impose any requirement different from, or in addition to, FDCA requirements applicable to the device." *Id.* at ——, 116 S.Ct. at 2263. Justice Breyer, in a separate opinion, provided the decisive vote when he sided with Justice O'Connor. Justice Breyer wrote that the MDA could preempt a state requirement "that takes the form of a standard of care or behavior imposed by a state-law tort action." *Id.* at ——, 116 S.Ct. at 2260. The majority of the Court concluded, therefore, that a state common law cause of action may constitute an additional "requirement" preempted by the MDA.

The majority of the *Medtronic* Court, however, determined that the MDA preempts a state law cause of action when the state requirements are different from, or in addition to, a device-specific federal requirement. Although Justice O'Connor concluded that the MDA preempted any state requirement different from or in addition to a general federal requirement, the majority of the Court disagreed, with Justice Breyer once again providing the decisive vote. *See Medtronic* at —— – ——, 116 S.Ct. at 2260–61 (Breyer, J., concurring). Justice Stevens' opinion set forth certain criteria for determining whether the MDA preempted a state requirement. He found that the MDA preempts only requirements that are "with respect to" medical devices. *Id.* at ——, 116 S.Ct. at 2257. Additionally, "[S]tate requirements of general applicability are not preempted except where they have the effect of establishing a substantive requirement for a specific device. Moreover, federal requirements must be applicable to the device in question, and, according to the regulations, preempt state law only if they are specific counterpart regulations or specific to a particular device." *Id.* (internal quotation marks omitted).

The Court unanimously concluded that the MDA does not preempt state causes of action that impose duties that mirror the FDA regulations. This is because these causes of action do not create any additional or different requirements than the FDA.

> Where a state cause of action seeks to enforce an FDCA requirement, that claim does not impose a requirement that is different from, or in addition to requirements under federal law. To be sure, the threat of a damages remedy will give manufacturers an additional cause to comply, but the requirements imposed on them under state and federal law do not differ. Section 360k does not preclude States from imposing different or additional remedies, but only different or additional requirements.

*Id.* at ——, 116 S.Ct. at 2264 (O'Connor, J, concurring in part and dissenting in part) (internal quotation marks omitted) (emphasis in original).

In sum, a fair reading of *Medtronic* indicates that the MDA preempts any state requirements that are different from, or in addition to, FDA requirements that are specific to one device. An analysis under this precedent is thus two-pronged: (1) a court must determine if the FDA specifically regulates the device in question, and (2) a court

must determine if the state requirements are different from, or in addition to, the federal requirements.

A majority of the *Medtronic* Court concluded that each of the plaintiff's claims survived the preemption analysis. The Court placed great emphasis on the device in question, a pacemaker, and the fact that it had not undergone the rigorous PMA process. The pacemaker only reached the marketplace because it was "substantially equivalent" to another device, and the Court observed that the 510(k) process focused only on equivalence, not on safety. *Id.* at ——, 116 S.Ct. at 2254. Therefore, no device-specific regulation by the FDA existed, which is a condition for preemption of state requirements by the MDA.

### III. *Applying Medtronic to the Instant Case*

■ As the Court has noted previously, the PMA screening process that the Ligament satisfied is significantly more demanding than the "substantially equivalent" process at issue in *Medtronic*. During the PMA process, the federal government has "weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers." *Medtronic* at ——, 116 S.Ct. at 2258. Therefore, this Court follows the teaching of the majority of those that have considered the issue, and determines that the PMA process constitutes the type of specific federal regulation of a product that can have a preemptive effect under the MDA. *See, e.q., Mitchell v. Collagen Corp.*, 126 F.3d 902 (7th Cir.1997); *Steele v. Collagen Corp.*, 54 Cal. App.4th 1474, 63 Cal.Rptr.2d 879 (1997); *Easterling v. Cardiac Pacemakers, Inc.*, 986 F.Supp. 366, (E.D.La. 1997); *Fry v. Allergan Medical Optics*, 695 A.2d 511 (R.I.), *cert. denied*, —— U.S. ——, 118 S.Ct. 374, 139 L.Ed.2d 291 (1997); *but see Sowell v. Bausch & Lomb, Inc.*, 230 A.D.2d 77, 656 N.Y.S.2d 16 (1997); *Lakie v. SmithKline Beecham*, 965 F.Supp. 49 (D.D.C.1997).

■ As the Court determined in the March 1995 Opinion, plaintiff's state law tort claims that defendant generally was negligent, careless, and reckless in the manufacture, design, construction, labeling, packaging, distribution, and sale of the Ligament, as well as the plaintiff's claim for breach of implied warranty, impose safety and effectiveness requirements that are different from, or in addition to, those established under FDA regulations. *See* March 1995 Opinion at 12–13, 18. Consequently, there has been no change in the controlling case law for plaintiff's claims that are not specific to the Ligament implanted in Richman; her motion to modify the Court's decision as to these claims must fail.

■ Plaintiff contends, however, that her claim is also rooted in the negligent manufacture of the specific Ligament that was implanted in her. The March 1995 Opinion held that the MDA likewise preempted these claims as a matter of law, because the weight of the case law mandated that the FDA is responsible for investigating alleged failures to comply with its standards, and that no private right of action exists to enforce a manufacturer's compliance with FDA requirements. *See* March 1995 Opinion at 14–15. The Supreme Court's opinion in *Medtronic*, however, calls for a different result. The Justices unanimously concluded that a state common law action is not preempted if it imposes duties that mirror the FDA regulations. A cause of action under this theory would not impose any different or additional duties on the manufacturers, but would provide only an additional *remedy* to plaintiff. Therefore, to the extent that Richman's claim of negligent manufacturing alleges that Gore failed to meet the standards set forth in the PMA process, the MDA does not preempt this claim. *See Mitchell*, 126 F.3d at 914 (MDA does not preempt claims alleging that defendant failed to meet the standards set forth in the PMA process); *see also Easterling*, 986 F.Supp. 366, 374. Accordingly, the MDA does not prevent Richman from pursuing her claim that in the manufacture of the specific Ligament implanted into the plaintiff, Gore varied from the standards set by

the FDA during the PMA process. This is the only claim, however, that survives.

## CONCLUSION

For the reasons stated above, plaintiff's motion to modify the Court's March 24, 1995 Opinion is HEREBY GRANTED in part and DENIED in part. The parties are directed to appear at a pre-trial conference in Courtroom 18B at 500 Pearl Street on January 23, 1998 at 11:00 a.m.

**SO ORDERED.**