**Richard G. LAKE and Frances C. Lake, Plaintiffs,**

**v.**

**TPLC d/b/a Telectronics Pacing Systems, Inc., Defendant.**

**No. Civ.A. 96–11665–GAO.**

United States District Court, D. Massachusetts.

April 1, 1998.

Frederic N. Halstrom, Halstrom Law Offices, Boston, MA, for Plaintiffs.

Frank J. Bailey, Nereyda F. Garcia, Sherin & Lodgen, Boston, MA, Michael J. Weber, Feldman, Gale & Weber, Miami, FL, for Defendant.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

This is a products liability case involving a cardiac pacemaker and pacemaker lead wire manufactured by the defendant TPLC d/b/a Telectronics Pacing Systems, Inc. ("Telectronics"). The plaintiffs' claims relate to a "cardiac pacing system" that was implanted in him on September 4, 1991, and thereafter removed, and subsequent reimplantation. A "cardiac pacing system" consists of two primary components, an implantable pacemaker or "pulse generator," and one or more pacemaker "lead" wires. The pulse generator at issue is a Telectronics Meta DDD Model 1230 (the "1230 pacemaker"), and the pace-

maker lead is a Telectronics Model 330854 atrial lead (the "854 lead"). The plaintiffs alleges negligence and breach of warranty by Telectronics in the manufacture of the cardiac pacing system. Telectronics has moved for summary judgment on the sole ground that all of the plaintiffs' claims are preempted by the Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic Act ("MDA"), 90 Stat. 539 (codified in scattered sections of 21 U.S.C.).

### FDA Review and Approval

The MDA provides for review and approval by the federal Food and Drug Administration ("FDA") of the design, manufacturing, labeling, sale, and monitoring of medical devices. Medical devices are categorized as Class I, II, or III depending on the risk they pose to the public. A Class III medical device is one that either "is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, or presents a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C)(ii)(I), (II)(1998). The 1230 pacemaker and the 854 lead at issue in this case are both Class III devices. *See* 21 C.F.R. § 870.3610 (1998).

Before a new Class III device may be marketed, the manufacturer must provide "reasonable assurance" to the FDA that the device is both safe and effective. *See* 21 U.S.C. § 360e(d)(2). The process is known as "premarket approval" or "PMA." The PMA process entails a thorough review, *see* 21 U.S.C. § 360e(c), (d), and once the FDA has issued PMA approval for a device, the manufacturer may not change any of the aspects of the device unless the changes also undergo PMA scrutiny and receive approval from the FDA. *See* 21 U.S.C. § 360e(d)(6), 21 C.F.R. pt. 814.37 (1998).

There are three exceptions to the thorough PMA process. First, as to existing medical devices being marketed as of the enactment of the MDA, Congress included a "grandfathering" provision. 21 U.S.C. § 360e(b)(1)(A). Second, to prevent manufacturers of grandfathered devices from enjoying a monopoly while potential competitors submitted new devices for rigorous

PMA review, the MDA recognizes an exception for devices that are "substantially equivalent" to those already on the market. 21 U.S.C. § 360e(b)(1)(B). As to these devices, a manufacturer need only submit a "premarket notification" for limited FDA review. Such devices are often referred to as "510(k) devices," after the pertinent section of the statute. The final exception to full PMA review, not relevant here, involves experimental devices used in controlled circumstances.

The 1230 pacemaker implanted in the plaintiff underwent the full PMA process before being approved by the FDA. The 854 atrial lead, on the other hand, only underwent the more relaxed premarket notification or 510(k) process, pursuant to which it was found by the FDA to be "substantially equivalent" to devices already on the market.

### Preemption

Section 360k(a) of the MDA contains the following preemption provision:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

The FDA has promulgated a regulation interpreting this preemption provision:

State ... requirements are preempted only when ... there are ... specific [federal] requirements applicable to a particular device, ... thereby making any existing divergent State ... requirements applicable to the device different from, or in addition to, the specific [federal requirements].

21 C.F.R. § 808.1(d) (1998).

The questions presented by the defendant's motion are (1) whether the detailed PMA process and the 510(k) "substantial equivalence" determination constitute "specific requirements applicable to a particular

device" so as to implicate the preemption provision, and (2) if so, whether the plaintiffs' state common law causes of action constitute state requirements which are "different from, or in addition to," the federal requirements.

### 1. The 854 Atrial Lead

In this case, the 854 atrial lead was approved pursuant to the 510(k) premarket notification process as a device "substantially equivalent" to other leads already being marketed. In *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), although they differed on other issues, all nine Justices of the Supreme Court agreed that the 510(k) "substantial equivalence" process does *not* impose specific federal requirements on the design of a medical device and therefore does not preempt state law claims of defective design or manufacture. *See Lohr*, 116 S.Ct. at 2254–55 ("There is no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was intended to do anything other than maintain the status quo with respect to the marketing of existing medical devices and their substantial equivalents. That status quo included the possibility that the manufacturer of the device would have to defend itself against state-law claims.").

Even so, the defendant argues that, in this case, the FDA review leading to its finding of "substantial equivalence" for the 854 lead must be understood as giving implicit specific approval to the product. Its contention is that the 854 lead was part of a pacing system that underwent clinical trials in connection with Telectronics' Model 1250H pacemaker, and the results of that investigation were subsequently included as part of PMA applications for the Model 1250H and 1230 pacemakers. Telectronics argues that the PMA approval of the 1250H should be considered the equivalent of PMA approval for the 854 leads that were used in the clinical trials. Telectronics' proposition is that approval of the pacemaker system as a whole implies approval of each of the parts of the system. But apart from asserting the proposition, Telectronics does not show why it must necessarily be true. Whether it were true in any particular case would seem to depend on the scope and scale of the evaluation of the system. Testing of the pacemaker system as an operating unit might, for example, say something about the electrical conductivity of the leads but imply nothing at all about their tensile strength. Telectronics does not show how the circumstances of the particular study involved make it likely—let alone necessary—that the PMA approval of the system was the equivalent of PMA approval of the individual leads. That proposition is made even more dubious when it is considered that the study at issue actually employed not just the 854 lead but seventeen different models of leads.

Accordingly, the plaintiffs' state law claims concerning the 854 lead are not preempted.

### 2. The 1230 Pacemaker

*Lohr* did not address the separate issue whether approval through the more rigorous PMA process has the effect of imposing specific federal requirements on the device, for purposes of the preemption clause. *See Lohr*, 116 S.Ct. at 2254–55, 2261, 2263–64. Circuit courts have varied as to whether it does, but a majority seem to conclude that, where safety is a primary concern, the PMA process does impose specific federal requirements. *See Mitchell v. Collagen Corp.*, 126 F.3d 902 (7th Cir.1997); *Papike v. Tambrands, Inc.*, 107 F.3d 737, 741 (9th Cir.1997); *Martin v. Telectronics Pacing Sys., Inc.*, 105 F.3d 1090, 1096 (6th Cir. 1997). Some state courts have come to the same conclusion. *See Fry v. Allergan Medical Optics*, 695 A.2d 511 (R.I.1997); *Steele v. Collagen Corp.*, 54 Cal.App.4th, 1474, 63 Cal. Rptr.2d 879 (Cal.Ct.App.1997).[1]

This seems the better view, and this Court will follow it in this case. With regard to the

---

1. There have been contrary views. *See Lakie v. SmithKline Beecham*, 965 F.Supp. 49 (D.D.C. 1997) (holding, without extensive discussion, that the PMA process is not a specific regulation); *Sowell v. Bausch & Lomb, Inc.*, 230 A.D.2d 77, 656 N.Y.S.2d 16 (N.Y.App.Div.1997) (holding that the PMA process is not a specific regulation because the requirements are not contained in a formal regulation). *See also Comeau v. Heller*, 945 F.Supp. 7 (D.Mass.1996) (no total preemption so as to confer federal question jurisdiction).

1230 pacemaker, specific federal requirements are imposed by reason of the PMA approval given by the FDA.

That conclusion requires that the second question also be answered. Do state common law causes of action create requirements *different from* or *in addition to* the requirements imposed by the PMA process? *Lohr* does not provide a clear answer. Justice Stevens, for himself and three other Justices, suggested that state common law claims are almost never "requirements" under the meaning of the preemption clause because they are not established "with respect to" a particular device. *Lohr*, 116 S.Ct. at 2257. Four dissenting Justices strongly disagreed with the proposition that the MDA preempts "few, if any, common-law duties." *Id.* at 2259. Justice Breyer, in the middle of this even split of opinion, was of the view that "the MDA will sometimes preempt a state-law tort suit." *Id.* at 2245.

After *Lohr*, the Seventh Circuit has held that state common law claims for strict liability and implied warranty of merchantability would impose greater burdens on the manufacturer than those imposed by the FDA and therefore were preempted. *Mitchell*, 126 F.3d at 902. Similarly, the Ninth Circuit has determined that labeling regulations promulgated under the MDA preempt state law claims for negligent failure to warn. *Papike*, 107 F.3d at 741.

The First Circuit has yet to address the question. However, First Circuit precedent decided before *Lohr* held that state law causes of action were preempted by the MDA. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 16 (1st Cir.1994) (finding that the MDA's preemption clause "expresses Congress's intent to preempt certain common law claims because such claims may establish state 'requirements' "); *Talbott v. C.R. Bard, Inc.*, 63 F.3d 25, 27 (1st Cir.1995) (stating "In [other cases] this Court has ruled that Congress understood state tort law to impose a 'requirement' such as to subject state tort law to the MDA's preemption clause."). The ambiguity of *Lohr* on this precise point leaves vitality in these precedents, and this Court should continue to follow them.

Accordingly, since the answer is "yes" to both critical questions, it must be concluded that the plaintiffs' state law claims as to the 1230 pacemaker are preempted by the MDA.

*Conclusion*

For the foregoing reasons, Telectronics' motion to dismiss the plaintiffs' claims is GRANTED insofar as the claims relate to the 1230 pacemaker, but DENIED insofar as the claims relate to the 854 atrial lead.

SO ORDERED.