**Raymond E. ISBELL, Jr. and wife, Theresa Isbell, Plaintiffs,**

v.

**MEDTRONIC INC., Defendant.**

No. 96–1267.

United States District Court, W.D. Tennessee, Eastern Division.

Sept. 11, 1998.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TODD, District Judge.

Plaintiffs Raymond E. Isbell and wife, Theresa Isbell, filed this action against Defendant Medtronics, Inc., alleging claims for negligence, breach of express and implied warranties, and strict product liability arising out of the surgical implantation of a Medtronic cardiac pacing system in Plaintiff Raymond E. Isbell. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. Defendant has moved for summary judgment on the grounds that (1) Plaintiffs' claims are preempted by federal law; (2) Tennessee's Learned Intermediary Doctrine bars Plaintiffs' failure to warn claim; and (3) Plaintiffs' remedies for breach of warranty are limited. Plaintiffs have responded to the motion. For the reasons set forth below, Defendant's motion is GRANTED.

Motions for summary judgment are governed by Fed.R.Civ.P. 56. If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Fed.R.Civ.P. 56(c). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party may not rest upon the pleadings but must go beyond the pleadings and "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

"If the defendant ... moves for summary judgment ... based on the lack of proof of a material fact, ... [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter but only to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. Rather, "[t]he inquiry on a summary judgment motion ... is ... 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989)(quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. *Addickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### Background

Defendant is a manufacturer and distributor of medical devices, including im-

plantable cardiac pacemaker leads. A pacemaker model 7070 and a ventricular lead model 4004M [1] manufactured by Defendant were implanted in Plaintiff Raymond Isbell on May 16, 1991. On November 7, 1995, Plaintiff was notified that the polyurethane insulation in his pacemaker lead was susceptible to failure and should be replaced. Subsequently, the pacemaker lead was replaced.

Plaintiffs have asserted theories under Tennessee state law of negligence, strict liability, and breach of express and implied warranties and misrepresentation relating to the design, manufacture, and sale of the pacemaker lead.[2] Specifically, Plaintiffs allege that the pacemaker lead: was made of defective materials, was unreasonably unfit for its intended purpose, was incapable of safe operation during its expected useful life, contained metallurgical and insulation defects which rendered it unfit for its intended purpose, was subject to sudden and catastrophic failure, was incapable of accurate testing or inspection to determine whether it was prone to premature failure, was negligently designed, contained insufficient warnings of its tendency to fail, and was not adequately tested before being placed on the market. Complaint at para. 11.

### Preemption of State Law Claims

Defendant contends that it is entitled to judgment as a matter of law on the ground that Plaintiffs' claims, which are brought pursuant to Tennessee state law, are preempted by 21 U.S.C. § 360k(a).

In 1976, Congress enacted the Medical Device Amendments ("MDA") to the Food, Drug and Cosmetics Act, 21 U.S.C. § 360c et seq., amending 21 U.S.C. § 301 et seq. These amendments regulate the design, manufacture, and labeling of medical devices and require the Food and Drug Ad-

ministration ("FDA") to classify all medical devices intended for human use as either class I, class II or class III. 21 U.S.C. § 360c(a)(1). Pursuant to 21 C.F.R. § § 870.3610 and 870.3620, implantable cardiac pacemakers and pacemaker leads are designated as class III medical devices. Class III medical devices are required to undergo a process of premarket approval ("PMA") "to provide reasonable assurance of its safety and effectiveness." 21 U.S.C. § 360c(a)(1)(C).

The PMA process requires a manufacturer of a class III medical device to submit an extremely detailed application to the FDA. The application must include, inter alia, information relating to intended use, safety studies and test results, principles of operation, descriptions and specifications of components, a description of intended manufacturing methods, facilities and controls, packing, proposed labeling, and installation. 21 U.S.C. § 360e(c)(1); 21 C.F.R. § 814.20. Following the submission of an application, the FDA generally refers it to a panel of experts for further evaluation. 21 U.S.C. § 360e(c)(2). The FDA must approve or reject the application within six months, unless the time is extended. 21 U.S.C. § 360e (d)(1). Only after FDA approval may the manufacturer release the class III device commercially, and then only in accordance with any conditions specified in the PMA approval order. 21 C.F.R. § 814.80.

If a manufacturer proposes changes to an approved class III device, a PMA supplement must be submitted. 21 C.F.R. § 814.39. The procedures applicable to a PMA supplement are the same as those applicable to an original PMA, although the information required is limited to that necessary to support the proposed modifications. Id.

---

**1.** The lead is the portion of a pacemaker that transmits the heartbeat-steadying electrical signal from the "pulse generator" to the heart itself. Rachel Tumidolsky, *How Medtronic v. Lohr Has Redefined Medical Device Regulation*

*and Litigation,* 65 Def. Coons. J. 268, 270 (1998).

**2.** Plaintiff Theresa Isbell's claim is based on loss of consortium.

There are two exceptions to the premarket approval process. In order to permit competition with pre-existing devices, the statute permits devices that are "substantially equivalent" to medical devices in existence at the time that the MDA was enacted to avoid the PMA process. 21 U.S.C. § 360e(b)(1)(B). Additionally, new devices may be marketed under an investigational device exemption ("IDE"), which is an FDA-approved experiment: that allows an unapproved device to be used in human beings in order to collect data. The manufacturer is exempted from premarket approval obligations and other MDA demands during the term of the IDE. 21 U.S.C. § 360j(g); 21 C.F.R. §§ 812, 813. An IDE "permits a device that otherwise would be required to comply with a performance standard or to have premarket approval" to be used "for the purpose of conducting investigations of that device." 21 C.F.R. § 812.1.

The differences in the approval process for substantially equivalent devices and for those marketed under an IDE are as follows:

Manufacturers of "substantially equivalent" Class III devices must submit to a limited form of review known as "premarket notification" or "the § 510(k) process" which allows the device to be marketed without inquiry and without submitting much information if the FDA determines that the device is substantially equivalent to a preexisting device. In contrast to the lengthy PMA process, the 510(k) process is completed in an average of only 20 hours. . . .

Although investigational devices are not subject to the rigorous PMA process, they are subject to a different set of complex and comprehensive regulations which set forth detailed procedures for determining whether investigational devices are safe and effective.

To obtain approval of a device under the IDE, a manufacturer must submit an application to the FDA containing an abundance of information. Pursuant to

21 C.F.R. § 812.20, the manufacturer must submit an application setting forth a complete report of all prior investigations and a "description of the methods, facilities, and controls used for the manufacture, processing, packing, storage, and where appropriate, installation of the device, in sufficient detail so that a person generally familiar with good manufacturing practices can made a knowledgeable judgment about the quality control used in the manufacture of the device." 21 C.F.R. § 812.20.

Pursuant to 21 C.F.R. § 812.25, the manufacturer must submit a detailed statement regarding the intended use of the device and the objectives and planned duration of the investigational study; a written protocol describing the methodology to be used and an analysis of the protocol demonstrating that the investigation is scientifically sound; an analysis of all risks involved; a description of each component, ingredient, property, and principle of operation of the device; a detailed description of the methods, facilities and controls used for manufacturing, processing, packing, storing and installing the device; sample agreements between the manufacturers and all proposed investigators; detailed information about the health care professionals and institutions participating in the investigation; proposed labeling; proposed informed consent forms; and a full set of written procedures for monitoring the investigation, including record and report maintenance. Pursuant to 21 C.F.R. § 812.27, the manufacturer must submit a bibliography of every publication relevant to the evaluation of the device and information from non-clinical testing.

Based on the information submitted, the FDA will approve the device under the IDE unless "the risks to the subjects are not outweighed by the anticipated benefits to the subjects and the importance of the knowledge to be gained, or informed consent is inadequate, or the

investigation is scientifically unsound, or there is reason to believe that the device as used is ineffective." 21 C.F.R. § 812.30. Once the device is approved under the IDE, the device is exempted from, among other things, compliance with performance standards and good manufacturing practice requirements. *Martin v. Telectronics Pacing Systems, Inc.*, 105 F.3d 1090, 1095–96 (6th Cir.1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 850, 139 L.Ed.2d 751 (1998) (some citations omitted).

■ The doctrine of preemption, which is based on the Supremacy Clause of the United States Constitution, provides that a state law is invalid to the extent that it conflicts with federal legislation. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Preemption occurs in several circumstances. A state law is preempted (1) when Congress expressly so provides, *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); (2) when federal regulation of a legislative field is so comprehensive that there is no room for supplementary state regulation, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); and (3) when the state law is in actual conflict with a federal provision, *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Two recent Supreme Court decisions confirm that state common law damage actions are within the scope of a federal statute or regulation preempting state law "requirements." *See Medtronic v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (Five Justices agreed that a federal statute preempting state law requirements regarding medical devices applied to state common law damages actions as well as to state statutes and regu-

lations. (Breyer, J., concurring in the judgment); (O'Connor, J., concurring in part and dissenting in part)) and *Cipollone*, 505 U.S. at 548–49, 112 S.Ct. 2608 (Federal statute preempting state law requirements relating to cigarette labeling preempted some state common law claims).

The MDA contains a specific provision addressing the intended scope of its preemption:

(a) [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). Because an express preemption provision is provided in the MDA, the scope of the statutory language need only be considered in determining whether certain claims are preempted. *See Cipollone*, 505 U.S. at 517, 112 S.Ct. 2608.[3]

In *Medtronic v. Lohr*, 116 S.Ct. 2240 (1996), the Supreme Court addressed the preemptive scope of § 360k(a) with respect to state-law claims against the manufacturer of a Class III device marketed pursuant to the substantial equivalence process. After the plaintiff was implanted with an allegedly defective pacemaker lead, the plaintiff and her husband filed suit against the manufacturer alleging claims of negligence and strict liability under Florida state law. *Id.* 116 S.Ct. at 2248. The pacemaker lead had been exempted from the premarket approval process under § 510(k) because it was deemed substantially equivalent to those on the market

---

3. Plaintiffs rely, in part, on the rule proposed by the FDA stating that investigational device exemptions and/or premarket approval application approvals do not preempt state common law claims. However, the FDA has now withdrawn the proposed rule. *See* 1998 WL 9546970.

before the MDA was enacted. *Id.* In approving the pacemaker for distribution, the FDA had emphasized that its decision should not be construed as an endorsement of the pacemaker's safety. *Id.*

The district court granted the defendant's motion for summary judgment on the ground that the negligence and strict liability claims were preempted by § 360k(a) because the pacemaker complied with the FDA's regulations. *Id.* 116 S.Ct. at 2249. The Eleventh Circuit Court of Appeals reversed, in part, holding that the plaintiffs' negligent design claim and their strict liability claim were not preempted by the MDA. *Id.* The appellate court upheld the dismissal of the negligent manufacturing and negligent failure to warn claims on preemption grounds. *Id.* The Supreme Court granted the petition for certiorari in light of the division among the circuit courts over the extent to which common law claims are preempted by the MDA. *Id.* 116 S.Ct. at 2250.

In a plurality opinion authored by Justice Stevens and joined by Justices Kennedy, Souter, and Ginsburg, the Court held that the plaintiffs' claims were not preempted by the MDA. *Id.* 116 S.Ct. at 2258.[4] In determining the extent to which the MDA preempts state common law claims, the Court observed that, while § 360k(a) is an express preemption provision, the scope of federal preemption under § 360k(a) is ambiguous. *Id.* 116 S.Ct. at 2255. This ambiguity and Congress' express grant of authority to the FDA to implement the MDA entitle the FDA's interpretation of the statute to substantial weight. *Id.* 116 S.Ct. at 2256.

The FDA's regulations provide that:
State or local regulations are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act,

thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not 'requirements applicable to a device' within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g. requirements such as general electric codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

(2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.

21 C.F.R. § 808.1(d)(1996).

The Court followed the FDA's regulation in finding that none of the plaintiff's claims were preempted:
[S]tate requirements are pre-empted "only" when the FDA has established "specific counterpart regulations or . . . other specific requirements applicable to a particular device" . . . [T]he statute is not intended to pre-empt "[s]tate or local requirements of general applicability where the purpose of the requirement relates . . . to other products in addition to devices."

116 S.Ct. at 2257 (quoting 21 C.F.R. § 808.1(d)). Thus, for preemption to occur, there must be a device-specific federal

---

**4.** Justice Breyer concurred in part and concurred in the judgment. Thus, the five sections joined by Justice Breyer. i.e., sections I, II, III, V, and VII, represent the opinion of the Court.

regulation and a specific state requirement. *Id.* Furthermore, the state requirement must be different from, or in addition to, the federal requirement; state law claims that rest on duties "equal to, or substantially identical to, requirements imposed under federal law" are not preempted. *Id.* 116 S.Ct. at 2256.

The Court determined that the § 510(k) or "substantial equivalency" process did not create device-specific federal requirements, and the FDA's general manufacturing and labeling regulations were not specific enough to preempt state law. *Id.* at 2254–55, 2258.[5] The Court further noted that the plaintiff's common law claims of negligence and strict liability were not specific to the device. *Id.* at 2258. Thus, the plaintiff's state law claims were not preempted by federal law.

The Sixth Circuit explained the *Lohr* holding as follows:

> The Medtronic device's exemption from the PMA process by way of the § 510(k) notification process was central to the outcome of *Medtronic [v. Lohr].* Justice Stevens, speaking for the Court, recognized that the § 510(k) process is "focused on equivalence, not safety," and as a result, "substantial equivalence determinations provide little protection to the public." Having concluded that the device implanted into Lohr was never formally reviewed under the MDA for safety and efficacy because it was not approved pursuant to the PMA process, the Court held that the Lohrs' design defect claim was not preempted.

*Martin,* 105 F.3d at 1096 (citations omitted).

The *Lohr* Court found that a claim that the defendant had failed to comply with

FDA regulations would not be preempted because "nothing in § 360k denies [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Lohr,* 116 S.Ct. at 2255.

*Lohr* did not address the issue of whether approval through the more stringent PMA process has the effect of imposing specific federal requirements on the device, for purposes of the preemption clause. However, a majority of the courts that have considered the issue have concluded that, when safety is a primary concern, the PMA process does impose specific federal requirements. *See Mitchell v. Collagen Corp.,* 126 F.3d 902 (7th Cir.1997) (State common law claims for strict liability and implied warranty of merchantability would impose greater burdens on the manufacturer than those imposed by the FDA and, therefore, are preempted.); *Papike v. Tambrands, Inc.,* 107 F.3d 737 (9th Cir. 1997) (Labeling regulations promulgated under the MDA preempt state law claims for negligent failure to warn.); *Martin v. Telectronics Pacing Sys., Inc.,* 105 F.3d 1090 (6th Cir.1997); *Lake v. TPLC,* 1 F.Supp.2d 84 (D.Mass.1998); *Easterling v. Cardiac Pacemakers, Inc.,* 986 F.Supp. 366 (E.D.La.1997) (MDA preempts state claims to the extent that they assert negligence or strict liability despite the manufacturer's adherence to standards set forth by FDA in its premarket approval.) *Oja v. Howmedica, Inc.,* 111 F.3d 782 (10th Cir.1997) (A device-specific federal labeling regulation does not preempt a general common law duty to warn).

In *Martin v. Telectronics,* 105 F.3d 1090 (6th Cir.1997), the Sixth Circuit applied *Lohr* to the issue of whether state law

---

**5.** Although they differed on other issues, all nine Justices agreed that the 510(k) "substantial equivalence" process does not impose specific federal requirements on the design of a medical device and therefore does not preempt state law claims of defective design or manufacture. 116 S.Ct. at 2254–55 ("There is no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was intended to do anything other than maintain the status quo with respect to the marketing of existing medical devices and their substantial equivalents. That status quo included the possibility that the manufacturer of the device would have to defend itself against state-law claims").

claims brought against the manufacturer of a device approved through the IDE process were preempted by federal law. The court found that:

> Unlike the general federal requirements discussed in *Medtronic*, the regulations governing investigational devices are essentially device specific. There are no specific regulations governing pacemakers like the one at issue; however, the application and approval process under the IDE is device specific. For example, the FDA requires information regarding "the methods, facilities, and controls used for manufacture ... of the device, in sufficient detail so that a person generally familiar with good manufacturing practices can make a knowledgeable judgment about the quality control used in the manufacture of the device." 21 C.F.R. § 812.20(b)(3). The FDA then exempts the device, if approved, from the general requirements of good manufacturing practice that would ordinarily apply. 21 C.F.R. § 812.1(a). In reviewing the application, the FDA calculates the risks and benefits of the particular device and grants an exemption only if the risks are outweighed by the benefits to the subjects, 21 C.F.R. § 812.30(b)(4).

*Id.* at 1097.

The court considered the plaintiffs' manufacturing defect claim and found that the regulations governing manufacturing of the device at issue specifically applied to investigational devices, unlike the claim in *Lohr. Id.* at 1098. Additionally, "[g]iven that the FDA specifically approves of the manufacturing adequacy of the device for investigational purposes under 21 C.F.R. § 812.30(b)(5) and exempts an investigational device from the good manufacturing requirements normally applicable to devices approved under the PMA process, the state statute applies a requirement different from that imposed by federal law." *Id.* at 1098–99.

> To allow a cause of action for a manufacturing defect under state law where the

FDA has specifically exempted an investigational device from Good Manufacturing regulations would thwart the goals of the IDE exemption "to encourage, to the extent consistent with the protection of public health and safety and with ethical standards, the discovery and development of useful devices intended for human use." 21 U.S.C. § 360j(g).

*Id.* at 1099. Therefore, the court found that the manufacturing defect cause of action was preempted.

In considering the plaintiff's design defect claim, the court noted that the *Lohr* Court had rejected a preemption defense because the device was approved pursuant to the § 510(k) process and, therefore, was never reviewed for safety and efficacy. *Id.* The device in *Martin*, however, was approved as an investigational device and, thus, its risks and benefits were specifically reviewed in accordance with 21 C.F.R. § 812.30. *Id.* The court found that the design defect claim was preempted because "[t]o allow a cause of action for design defect where the FDA has specifically approved of the design of the device for investigational purposes would thwart the goals of safety and innovation." *Id.*

Plaintiffs' inadequate warning claim was also found to be preempted because the federal regulations regarding investigational devices set forth several requirements concerning warnings. *Id.* at 1100. Unlike *Lohr*, the labeling requirements were specific in that they applied only to investigational devices. *Id.* Although the *Lohr* Court had noted that the "failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use," the *Martin* court explained that allowing a state failure to warn claim "would impede the implementation and enforcement of specific federal requirements." *Id.*

> To allow a state cause of action for inadequate warnings would impose different requirements or requirements in addition to those required by federal

regulations. Such requirements would impede Congress' intent in enacting the investigational device exemption to promote the development of medical devices for human use, to the extent consistent with safety to human life.

*Id.* The court also concluded that, in the context of investigational devices, express warranty claims are preempted because express representations made about investigational devices are subject to comprehensive FDA regulation. *Id.*[6]

Neither *Lohr* nor *Martin* involved claims of a defective device that had been approved through the PMA process, as was the lead in the present case.[7] However, the analysis undertaken by the *Martin* court is appropriate here, especially in light of the fact that the PMA process is more rigorous than the IDE process, *see Martin*, 105 F.3d at 1095–96 ("[I]nvestigational devices are not subject to the rigorous PMA process....") Moreover, other courts which have considered devices subjected to the PMA process have determined that state law claims concerning those devices are preempted by federal law. *See Mitchell v. Collagen Corp.*, 126 F.3d 902 (7th Cir.1997) ( FDA's premarket approval of collagen injections was "specific to the product" and constituted approval "of the product's design, testing, intended use, manufacturing methods, performance standards and labeling," and, thus, plaintiff's negligence, adulteration, and mislabeling claims were preempted.); *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1422 & n. 3, 1424 n. 8 (5th Cir.1993) (pre-*Lohr* ) (When there exists a specific requirement under the FDA, such as the MDA's premarket approval process, state law claims are preempted.); *Lake v. TPLC*, 1 F.Supp.2d 84 (D.Mass.1998) (Under *Lohr*, state law claims relating to a pacemaker, which was approved through rigorous premarket ap-

proval process, were preempted by MDA.); *Easterling v. Cardiac Pacemakers, Inc.*, 986 F.Supp. 366 (E.D.La.1997) (State law claims were preempted to the extent that they asserted negligence or strict liability despite manufacturer's adherence to standards set forth by FDA in its premarket approval concerning pacemaker's design, testing, intended use, manufacturing methods, performance standards, and labeling.)

In the present case, the affidavit of Charles H. Swanson, Vice President of Pacing Regulatory Affairs for Defendant, establishes the following: In July 1988, Defendant submitted a PMA application to the FDA for its proposed model 4004 lead. The application was submitted as a supplement to the PMA application for the model 4003 lead.

According to Swanson's affidavit, the 4003 lead was clinically investigated prior to marketing in the United States. An IDE application was submitted to the FDA on March 26, 1982. The IDE included a report on prior testing and a detailed description of the clinical study plan, purpose, and protocol. The IDE also included copies of the proposed labeling and technical manual which contained the following warning:

> Leads may fail to function for a variety of causes, including but not limited to ... failure of leads by breakage or by breach of their insulation covering ... no representation is made that failure or cessation of functions of leads will not occur ....

The FDA denied the application and required a statistical analysis of the in vivo electrical testing and a more thorough analysis of patient population in the clinical study protocol. Defendant submitted the requisite information, and the FDA approved the IDE application.

---

**6.** The *Lohr* Court was not presented with a breach of warranty claim.

**7.** *Lohr* involved a device approved through the "substantial equivalent" process through § 510(k), and *Martin* involved a device ap-

proved through the IDE process. The Supreme Court has not decided whether the FDA's more rigorous premarket approval process creates specific federal requirements that preempt conflicting state requirements.

On June 27, 1983, Defendant presented its yearly progress report to the FDA in accordance with 21 C.F.R. § 812.150(b). The report stated that there had been 69 implants of Model 4003/4503 and that the performance of the leads had been satisfactory. On October 9, 1984, Defendant filed its second yearly progress report on the IDE. As of September 1, 1994, there had been 93 implants of the leads, with the longest duration 28 months and the average duration 8.9 months. The third yearly progress report stated that, as of June 15, 1985, there had been 105 implants with an average duration of 15.6 months. At the FDA's request, more detailed information regarding survival experience was submitted. On October 10, 1985, the FDA approved a material change to the conductor coil and a reduction in the follow-up requirements for patients involved in the clinical study. The fourth yearly progress report showed 115 clinical implants with an average duration of 22 months.

As required by 21 C.F.R. § 812.150(b)(7), Defendant notified the FDA on August 13, 1986, that the clinical study had been terminated. Defendant submitted its clinical study report which showed that a total of 118 model 4003/4503 leads had been implanted in 110 patients. On April 20, 1987, the FDA acknowledged completion of the investigation, and the IDE application was closed.

Swanson's affidavit describes the premarket approval process for model 4003/4503 as follows: On September 30, 1983, Defendant submitted a premarket approval application to the FDA, seeking approval to market model 4003 commercially in the United States. The application contained detailed preclinical test information and data and a detailed description of the product design and the manufacturing facility, processes, and controls used to market model 4003. The design information included engineering drawings of the devices and their components, operational principles, mechanical design information, and de-

sign verification and validation information. The manufacturing information included manufacturing process flow charts, process descriptions, identification of principal manufacturing equipment used, quality controls and procedures applied, and manufacturing facility descriptions. The application contained full copies of proposed product labels and the technical manual to be distributed with model 4003.

After its initial review of the PMA application, the FDA sought additional information concerning the protocols for the in vitro and animal testing and required Defendant to "address the fate of the implanted lead, in terms of potential long term degradation of the insulating materials." Defendant submitted a detailed response describing the testing and studies that had been done to evaluate the suitability of the insulating material for long term implant in unipolar permanent pacing leads. Defendant reported its conclusion that, based on the testing and analysis presented to the FDA, the insulation material was biostable and suitable for long term implant on models 4003/4503 pacing leads. Defendant also submitted a bibliography of published literature which addressed in vivo degradation of polyurethane, the long term biostability of polyurethane leads, environmental stress cracking, and the effect of processing conditions on polymers.

In response to another request from the FDA for additional information, Defendant submitted an amendment to its PMA application. The amendment reported on prior clinical experience with seven unipolar polyurethane lead models using data received from the chronic lead study, the Medtronic returned product analysis, and the CardioCare monitoring service.

The FDA requested further information concerning the biostability of polyurethane insulation, and Defendant submitted additional data based on clinical experience with lead models in similar designs. Defendant reported on the clinical experience

of Models 4003/4503 which had been under clinical evaluation since April 26, 1982. As of January 1, 1986, none of the leads in the 110 implants had exhibited insulation failure. The FDA also required Defendant to revise the warranty disclaimer statement in the labeling. Defendant submitted a modified version of the warning and warranty information in an amendment to the PMA.

On April 25, 1986, the FDA notified Defendant that the amended PMA was deemed suitable for filing and was ready to undergo scientific and compliance review. Defendant was informed that the PMA could not be approved until the FDA had determined that the manufacturing facilities, methods, and controls complied with applicable "Good Manufacturing Practices" pursuant to 21 C.F.R. Part 820.

The Circulatory System Devices Panel considered the PMA application on May 23, 1986. The physician members of the panel concluded that both silicone and polyurethane should be available as options for lead insulating material. The panel recommended that the application be approved, and the FDA accepted the recommendation subject to certain "conditions of approval." (Attached as Exhibit 2 to Swanson's Affidavit.) The sale, distribution, and use of the device were restricted to prescription use in accordance with 21 C.F.R. § 801.109.

According to Swanson's affidavit, Defendant submitted its PMA application on model 4004/4504 on July 15, 1988, as a supplement to the model 4003 PMA application. The supplement included a summary of safety and effectiveness, device characteristics and manufacturing, performances standards, a technical section, animal data and clinical investigation, and proposed labeling. A detailed description of each test performed, rationale, equipment, methods, and results was reported. The biostability of the polyurethane insulation was addressed, including a history of polyurethane use in implantable medical devices and a description of improvements

made to the leads to guard against environmental stress cracking.

The supplement described the configuration differences between unipolar leads, such as models 4003/4503, and bipolar leads, such as models 4004/4504. The supplement noted that unipolar leads have thicker insulation, making them more resistant to degradation mechanisms and to implant damage. The supplement described actions that had been taken to eliminate insulated-related complications found in other models. Based on Defendant's research, testing, and evaluation and the improvements incorporated in models 4004/4504, the supplement concluded that the models were safe and effective with respect to biostability.

The supplement contained a manufacturing section which described the manufacturing process and quality control procedures. Copies of proposed package labeling and proposed technical manuals and specification sheets were submitted as part of the supplement. The proposed technical manual listed insulation failure as a potential complication. The proposed manual contained the following warning:

> Leads may fail to function for a variety of causes, including but not limited to: medical complications, body rejection phenomena, allergic reaction, fibrotic tissue, or failure of the leads by breakage or by breach of their insulation covering ... leads may be easily damaged before, during, or after insertion by improper handling or other intervening acts. Consequently, no representation or warranty is made that failure or cessation of function of leads will not occur ... or that the lead will, in all cases, restore adequate cardiac function.

The warning referred to an enclosed card for complete warranty information.

The supplement was reviewed by the FDA and was approved on February 10, 1989. The approval was subject to certain conditions such as the requirement that

Defendant submit a PMA supplement before making any changes that could affect the safety or effectiveness of the device and the requirement that post-approval reports be submitted. An amendment to the supplement was submitted and subsequently approved by the FDA.

Under the preemption analysis set forth in *Lohr*, this court must ask two questions: (1) Is the lead subject to a device-specific federal requirement? and (2) Would the application of the state "requirement" impose standards that are different from, or in addition to, the device-specific federal requirements? *Mitchell*, 126 F.3d at 911. Swanson's affidavit establishes that Defendant's design, testing, manufacturing methods, facilities, controls, materials, and labeling of the model 4004M pacemaker lead have all been approved by the FDA in accordance with the standards and procedures established by the MDA. Plaintiffs have failed to refute Swanson's affidavit.[8] The PMA process required Defendant to provide the FDA with samples of the device, an outline of the device's components and properties, a description of the manufacturing process, copies of the proposed labels, various other data and information, and any other information that the FDA requested. 21 C.F.R. § 814.20. The model 4003 lead has been scrutinized by the FDA since 1982 and model 4004 since 1988. The FDA's approval was subject to the conditions described in the "Conditions of Approval." That form specified that before making any changes that could affect the safety or effectiveness of the device

Defendant must submit a PMA supplement for review and approval by the FDA.

Although the FDA's requirements are generic in the sense that the "Conditions for Approval" are imposed upon each device subject to the PMA process, the FDA's explicit approval of the lead constitutes device-specific requirements. *See Mitchell*, 126 F.3d at 913 ("Approval by the FDA constitutes approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling. The FDA's determination is specific to the product"). That is, once the FDA approves a specific design, that design becomes, in effect, the FDA requirement.

Obtaining FDA-approval through the PMA process is not a routine matter. *Easterling*, 986 F.Supp. at 369 (FDA spends an average of 1,200 hours reviewing each device.)

Moreover, as the Supreme Court recognized, the PMA process is significantly different from the "substantial equivalent" inquiry under § 510(k). That process merely requires the device to be "substantially equivalent" to a pre-existing device; the FDA does not require those devices "to take any particular form for any particular reason." *Medtronic*, 116 S.Ct. at 2254. The PMA process reflects the government's careful consideration of the risks and benefits of the device, and the FDA's approval of a device constitutes a set of federal requirements that are imposed upon the

---

8. The court has not considered the unsworn documents presented by Plaintiffs in opposition to Defendant's motion for summary judgment. Rule 56(e) of the Federal Rules of Civil Procedure states, in pertinent part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

A non-moving party cannot avoid summary judgment by trying to create a material issue of fact through allegation and unsworn documents. *U.S. v. Glass Nursing & Convalescent Homes, Inc.*, 550 F.Supp. 1149, 1154 (S.D.Ohio 1982); *Inmates, Washington Cty. Jail v. England*, 516 F.Supp. 132, 138 (E.D.Tenn.1980), *aff'd*, 659 F.2d 1081 (6th Cir.1981). "It has long been settled law that a plaintiff must respond to an adequate motion for summary judgment with admissible evidence." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 191 (5th Cir.1991) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 n. 19, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

specific device in order to render the device safe and effective. As the Seventh Circuit stated in *Mitchell,* FDA approval "constitutes approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling." *Mitchell,* 126 F.3d at 912.

*Easterling,* 986 F.Supp. at 369.

Because the PMA process requires a demonstration that a device is both safe and effective, *see* 21 U.S.C. § 360e(d)(2), it constitutes the type of specific federal regulation of a product that can have a preemptive effect under the first prong of *Lohr.*

▮ Additionally, the application of the state law "requirements" would impose standards that are different from, or in addition to, the device-specific federal requirements. Plaintiffs' claims that Defendant was negligent in the manufacture, design, construction, labeling, packaging, and sale of the lead, along with their claim for breach of warranty, impose safety and effectiveness requirements that are different from, or in addition to, those established under FDA regulations. A finding of negligence or strict liability would force Defendant to alter certain aspects of the lead in response to the finding of liability. This would impermissibly "impose an additional or different state requirement upon the design, manufacture, marketing and sale of [the product]." *See King v. Collagen Corp.,* 983 F.2d 1130, 1136 (1st Cir. 1993). Therefore, Plaintiffs' state law claims are preempted, and Defendant is entitled to judgment as a matter of law.[9] *Accord Chmielewski v. Stryker Sales*

*Corp.,* 966 F.Supp. 839 (D.Minn.1997) (Strict liability claim and negligent design and failure to warn claims were preempted by MDA.)

### *Learned Intermediary Doctrine*

▮ Defendant has moved for summary judgment on Plaintiffs' failure to warn claim on the additional ground of the learned intermediary doctrine. Under the learned intermediary doctrine, makers of unavoidably unsafe products who have a duty to give warnings may reasonably rely on intermediaries to transmit their warnings and instructions. *Pittman v. Upjohn Co.,* 890 S.W.2d 425, 429 (Tenn.1994) (citing Restatement (Second) of Torts, § 388 comment n, (1965)). The manufacturer may discharge its duty to market and distribute its products in a way that minimizes the risk or danger by distributing proper directions and adequate warnings to those who foreseeably could be injured by the use of the product. *Pittman,* 890 S.W.2d at 428–29.

In the present case, Defendant has presented the affidavits of Charles Swanson and Jackie Rae Elkins, senior paralegal for Defendant. The affidavits establish that Plaintiff's physician was warned that insulation failure was one of the risks associated with the use of the lead. The technical manual accompanying the lead included an express warning that the lead could fail to function because of breach of the insulation. (Swanson Affidavit at 61; Elkin Affidavit at 5, 6.)

Plaintiffs concede that Defendant's duty was a duty to warn "learned intermediaries." Plaintiffs, however, contend that

9. The MDA would not preempt a claim that the alleged defect was the result of the Defendant's failure to comply with the FDA-approved design specifications, manufacturing processes, or labeling requirements. In that case, there would be no imposition of requirements that were "different from, or in addition to," those of the MDA. Here, Plaintiffs have failed to make such a claim. *See Martin,* 105 F.3d at 1100 ("As indicated by *Medtronic [v. Lohr].* and as conceded by defendant, a claim that Telectronics did not comply with MDA regulations governing its device would not be preempted and the Martins could pursue a remedy in state court. However, plaintiffs failed to allege below that Telectronics did not comply with MDA regulations governing devices approved under the IDE. Thus, any remedy available to the Martins under a failure to comply with federal regulations theory has been waived.")

the reasonableness and adequacy of the warning is a fact issue for the jury. *See Pittman,* 890 S.W.2d at 429 (Learned intermediary doctrine does not shield a manufacturer from liability for inadequate warnings to the physician.) A warning is adequate when, "under all the circumstances, it reasonably discloses to the medical profession all risks inherent in the use of the drug which the manufacturer knew or should have known to exist." *Wilson v. Upjohn Corp.,* 968 F.2d 1217, 1992 WL 158121 (6th Cir.) (quoting *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831, 836–37 (1981)).

 Although the adequacy of a manufacturer's warning is usually a question of fact, it becomes a question of law when the warning is accurate and unambiguous. *Pittman* 890 S.W.2d at 429–30. In the present case, Plaintiffs have failed to present evidence to refute Defendant's affidavits that the medical profession was given sufficient warnings about the lead. Therefore, Defendant is entitled to summary judgment on Plaintiffs' failure to warn claim on this ground as well as on the ground of preemption.

### Limitation of Remedies for Breach of Warranty Claims

Defendant has moved for summary judgment on Plaintiffs' breach of warranty claims on the ground that Plaintiffs' remedies are limited to those set forth it the "replacement agreement/limited warranty." The court need not reach this issue in light of its determination that Plaintiffs' breach of warranty claims are preempted.

### Loss of Consortium Claim

Because Plaintiff Theresa Isbell's claim for loss of consortium is derivative of her husband's claim, Defendant is entitled to summary judgment on this claim for the reasons stated above.

### Conclusion

In conclusion, the Defendant's motion for summary judgment is GRANTED. All other motions now pending are DENIED as moot. The clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.