Patricia HUGHES (Surviving Spouse of James R. Hughes, Deceased), Plaintiff,

v.

Stephen L. COOK, M.D., the Stern Cardiovascular Center, P.A., Baptist Memorial Hospital, Inc., Baptist Memorial Hospital, Baptist Memorial Hospital East, and Medtronic Ave, Inc., Defendants.

No. 2:06CV02027 BBDTMP.

United States District Court, W.D. Tennessee, Western Division.

Sept. 27, 2006.

evidentiary support after a reasonable opportunity for further investigation or discovery."

Louis P. Chiozza, Jr., Chiozza & Associates, Memphis, TN, for Plaintiff.

Bradley E. Trammell, Leo Maurice Bearman, Jr., Baker Donelson Bearman Caldwell & Berkowitz, Memphis, TN, Ginger F. Heyman, Michael K. Brown, Mildred Segura, Reed Smith LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT MEDTRONIC VASCULAR'S MOTION FOR SUMMARY JUDGMENT

DONALD, District Judge.

Before the Court is the motion (D.E.# 2) by Defendant Medtronic Vascular, Inc. (formerly, Medtronic AVE, Inc.) ("Medtronic" or "Defendant") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. On January 28, 2005, Patricia Hughes ("Plaintiff"), representing her deceased husband John R. Hughes, filed the present action in the Circuit Court of Shelby County, Tennessee claiming strict product liability, negligence, and breach of express and implied warranties arising out of the surgical implantation of a Medtronic coronary stent in her husband.[1] Plaintiff's action was removed to the United States District Court for the Western District of Tennessee on January 13, 2006. Defendant has moved for summary judgment on two grounds: (1) Plaintiff's claims are preempted by federal law, and alternatively, (2) Plaintiff has failed to demonstrate that the Medtronic stent was defectively and negligently designed, manufactured, and labeled. For the reasons stated herein, this Court finds that the Defendant's motion is warranted and **GRANTS** Defendant's motion.

## I. BACKGROUND

Defendant is a manufacturer and distributor of medical devices, including the Medtronic S670 Discrete Technology Rapid Exchange Coronary Stent System ("S670D"). (Mem. Supp. Def.'s Mot. Summ. J. 2; Pl.'s Resp. Mem. Opp'n Mot. Summ. J. 8.) On December 5, 2000, Mr. Hughes was admitted to Baptist Memorial Hospital East in Memphis, Tennessee for an angioplasty procedure. (Comp. ¶ 17;

---

**1.** Jurisdiction is based on diversity of citizenship. *See* 28 U.S.C. § 1332 (2000).

Mem. Supp. Def.'s Mot. Summ. J. 1.) This procedure required the surgical insertion of the S670D stent—a three millimeter "expandable mess tube made of medical grade stainless steel"—into Mr. Hughes' blocked artery. (Aff. Charles H. Swanson ¶ 6.) When implanted, a "balloon" inside the S670D stent is inflated, which expands the stent and creates a "miniature scaffolding" that opens the artery. (*Id.*) Following expansion of the stent, the balloon inside the stent is deflated and removed. (Mem. Supp. Def.'s Mot. Summ. J. 2; Pl.'s Resp. Mem. Opp'n Mot. Summ. J. 8.) The now expanded stent, however, is left in place to keep the artery open, thus allowing the lining of the artery to eventually heal around it. (Aff. Charles H. Swanson ¶ 6.)

On December 5, 2000, Dr. Stephen L. Cook, one of Mr. Hughes' treating physicians, performed the angioplasty procedure. (Compl.¶ 18.) Dr. Cook, having worked with the S670D "at least a dozen times," removed the S670D from its packaging, and observed that it was not twisted or bent. (Pl.'s Resp. Memo. Opp'n Mot. Summ. J. 8.) Dr. Cook inserted the S670D into a bifurcated lesion located at the junction of two of Mr. Hughes' arteries. (Mem. Supp. Def.'s Mot. Summ. J. 2.) Although this junction created a near right angle making insertion more difficult, Dr. Cook found nothing unusual about Mr. Hughes' anatomy or medical history that warranted special precaution. (*Id.* at 10.)

Following insertion of the S670D, Dr. Cook successfully inflated the balloon inside the stent. (*Id.* at 11.) Once the stent had been expanded, however, Dr. Cook was unable to deflate and remove the balloon, resulting in significant restriction of blood flow to Mr. Hughes' heart. (*Id.*) Dr.

Cook first suspected that the difficult angle of the artery junction had created a "kink" in the balloon. (*Id.* at 9.) After inspecting the balloon and discovering no kink, Dr. Cook then suspected that the indeflator—a medical device used to inflate and deflate the stent balloon—was malfunctioning. (*Id.* at 11.) Dr. Cook changed indeflators, but was still unable to deflate the balloon. (*Id.*) After an unsuccessful attempt to deflate the balloon with empty syringes, Dr. Cook finally deflated and removed the balloon with a rotoblator. (*Id.* at 12; Mem. Supp. Def.'s Mot. Summ. J. 5.) Mr. Hughes, however, suffered a heart attack, and was placed on life support. (Mem. Supp. Def.'s Mot. Summ. J. 5.) Following emergency coronary artery bypass surgery, Mr. Hughes died on December 6, 2000. (*Id.*)

The Plaintiff has asserted Tennessee common law and statutory law claims of negligence, strict liability, and breach of express and implied warranties relating to the design, manufacture, labeling, and sale of the S670D stent.[2] (Comp.¶ 32.) Specifically, Plaintiff alleges that the Defendant: (1) failed to properly manufacture a nondefective product; (2) failed to provide and follow warnings and/or safety precautions for the use and operation of the stent; (3) failed to follow the laws regulating the manufacturing, shipping, maintenance and quality control of the stent; (4) breached implied warranty of merchantability and fitness for a particular purpose; (5) breached express warranties; and (6) negligently manufactured, designed, distributed, and marketed the S670D stent. (*Id.*)

## II.  SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to inter-

---

2. The Plaintiff has alleged statutory claims under the Tennessee Products Liability Act of 1978, Tenn.Code. Ann. §§ 29–28–101 to 108 (2000) and Tenn.Code Ann. §§ 47–2–313 to 315 (2000). Claims asserted under Tenn. Code Ann. § 47–2A–212 (2000) have no apparent applicability in this case.

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(C). Although hearsay evidence may not be considered on a motion for summary judgment, *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999), evidentiary materials presented to avoid summary judgment otherwise need not be in a form that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thaddeus–X v. Blatter*, 175 F.3d 378, 400 (6th Cir.1999). The evidence and justifiable inferences based on facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 460 (6th Cir.2001).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. This may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the nonmoving party's evidence to show why it does not support a judgment for the nonmoving party. 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2727, at 35 (2d ed.1998).

Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

The Defendant contends that it is entitled to judgment as a matter of law on two grounds: (1) the Plaintiff's Tennessee tort claims challenge the safety and effectiveness of the S670D stent—a Class III medical device—and thus, are preempted by 21 U.S.C. § 360k(a) (2000); and alternatively, (2) the Plaintiff has failed to produce any evidence creating a genuine issue of material fact as to whether under Tennessee law, the S670D was defectively or negligently designed, manufactured, labeled, and sold.

### A. Preemption of State Law Claims Under 21 U.S.C. § 360k(a)

In 1976, Congress enacted the Medical Device Amendments ("MDA"), Pub.L. No. 94–295, 90 Stat. 539 (1976) (codified as amended in scattered sections of 15 U.S.C., 21 U.S.C., 42 U.S.C.), to the Food, Drug and Cosmetics Act, Pub.L. No. 75–717, 52 Stat. 1040 (1938) (codified as amended at 21 U.S.C. § 301–397 (2000)). The amendments, a response to "mounting consumer and regulatory concern," allowed the Food and Drug Administration ("FDA") to regulate the design, manufac-

ture, and labeling of medical devices, and required the FDA to classify medical devices into three categories "based on the risk that they pose to the public." 21 U.S.C. § 360c(a)(1) (2000); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 476–77, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Devices in Class I present no unreasonable risk of illness or injury, and are subject only to minimal FDA regulation. § 360c(a)(1)(A). Class II devices are potentially more harmful, and although they can be marketed prior to FDA approval, they must comply with stricter federal performance regulations. § 360c(a)(1)(B).

Class III devices receive the strictest FDA regulation. A Class III medical device is one that:

> (I) ... (I) cannot be classified as a class I device because insufficient information exists to determine that the application of general controls are sufficient to provide reasonable assurance of the safety and effectiveness of the device, and (II) cannot be classified as a class II device because insufficient information exists to determine that the special controls ... would provide reasonable assurance of its safety and effectiveness, and
>
> (ii) (I) *is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health,* or (II) *presents a potential unreasonable risk of illness or injury.*

§ 360c(a)(1)(C) (emphasis added).

To market a Class III device, the MDA requires the manufacturer to undergo a

Premarket Approval Process ("PMA") in order "to provide [the FDA with] reasonable assurance of [the device's] safety and effectiveness." [3] *Id.* A manufacturer provides "reasonable assurance" by submitting an "extremely detailed" application, which includes "information relating to intended use [of the device], safety studies and test results, principles of operation, descriptions and specifications of [the device's] components, a description of intended manufacturing methods, facilities and controls, packing, proposed labeling, and installation." *Isbell v. Medtronic, Inc.*, 97 F.Supp.2d 849, 851 (W.D.Tenn.1998) (citing 21 U.S.C. § 360e(c)(2) (2000); 21 C.F.R. § 814.20 (2006)). Once the application is submitted, the FDA spends an average of 1200 hours reviewing and scrutinizing the proposed device. *Lohr*, 518 U.S. at 477, 116 S.Ct. 2240. If the FDA approves the medical device, the manufacturer may then release the device commercially in accordance with the PMA approval order. 21 C.F.R. § 814.80 (2006).

Any proposed changes to a PMA approved Class III medical device must be submitted to and approved by the FDA through the PMA Supplement process. 21 C.F.R. § 814.39 (2006). The PMA Supplement process employs the same procedures and level of extensive scrutiny that the original PMA process incorporates, "although the information required is limited to that necessary to support the proposed modifications." *Isbell,* 97 F.Supp.2d at 851.

---

**3.** Some Class III medical devices are exempt from the rigorous PMA approval process if they fall under one of two exceptions: (1) the device is "substantially equivalent" to other devices that were in existence when the MDA classification system was enacted in 1976, or (2) the device is being used in human beings as part of an FDA-approved experiment to collect data, i.e., the investigational device exemption. 21 U.S.C. § 360e(b)(1)(B) (2000); 21 U.S.C. § 360j(g) (2000); *see also* 21 C.F.R. §§ 812, 813 (2006). In the present case, the S670D stent did not fall under either exception, and received actual PMA Supplement approval. Therefore, this Court's discussion is limited to the rigorous PMA approval process only. (Aff. Charles H. Swanson ¶ 20.)

In addition to requiring medical device classification and approval, the MDA also expressly preempts certain state law "requirements" governing medical devices:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any *requirement*—

(1) which is *different from, or in addition to,* any requirement applicable under this chapter to the device, and

(2) which relates to the *safety or effectiveness* of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a) (2000) (emphasis added). Preemption is based on the Supremacy Clause of the United States Constitution, which provides that the "Laws of the United States ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Historically, federalism concerns have prevented federal law from preempting the states' police powers relating to public health and safety "unless Congress' intent to do so [was] clearly expressed." *Kemp v. Medtronic, Inc.,* 231 F.3d 216, 222 (6th Cir.2000) (citing *Hillsborough County, Florida v. Automated Medical Lab, Inc.,* 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)). If Congress, however, inserts an express preemption provision into a statute, "a court may not look beyond it to consider implied preemption."

*Id.* Rather, the court is bound by the express statutory language.

Despite the express language of § 360k(a), the Supreme Court in *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (plurality opinion), wrestled with the scope of the MDA's preemption clause. Of specific concern to the Court was whether state common law tort claims involving Class III devices were preempted under § 360k(a). The medical device in *Lohr*—a pacemaker—was a Class III medical device that had received FDA approval under the less extensive "substantially equivalent" exception to the PMA process.[4] *Id.* at 480, 116 S.Ct. 2240. Following implantation in the plaintiff, the pacemaker failed, "allegedly resulting in a 'complete heart block' that required emergency surgery." *Lohr,* 518 U.S. at 480–81, 116 S.Ct. 2240. The plaintiff's physician claimed that the pacemaker was defective, and the plaintiff brought suit, claiming strict products liability and negligence for defective design, manufacture, assembly, and sale. *Id.* at 481, 116 S.Ct. 2240.

In a plurality opinion authored by Justice Stevens, the Court, noting the absence of PMA approval, held that none of the plaintiffs' common law tort claims were preempted by § 360k(a).[5] *Id.* at 501–02, 116 S.Ct. 2240. The Court, however, acknowledging that it "need not go beyond [the express] language to determine whether Congress intended the MDA to pre-empt at least some state law," disa-

---

**4.** A medical device that is "substantially equivalent" to a Class III medical device in existence when the MDA was enacted in 1976 can avoid the rigorous PMA approval process. 21 U.S.C. § 360e(b)(1)(B) (2000); 21 U.S.C. § 360j(g) (2000); *see also* 21 C.F.R. §§ 812, 813 (2006); *supra* note 3. Also known as the "510(k) process," this process is "by no means comparable to the PMA process." *Lohr,* 518 U.S. at 479, 116 S.Ct. 2240. The 510(k) process is completed in an average of

20 hours, does not require the manufacturer to submit much information, and is rarely denied. *Id.*

**5.** Justice Stevens was joined by Justices Kennedy, Souter, and Ginsburg. Justice Breyer concurred in part and concurred in the judgment. Therefore, the five sections joined by Justice Breyer, i.e., sections I, II, III, V, and VII, represent the opinion of the Court.

greed over the " 'domain expressly preempted,' " i.e., the scope of the preemption. *Id.* at 484, 116 S.Ct. 2240 (quoting *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). The plurality determined that the word "requirement" in § 360k(a) was ambiguous and that "[t]he ambiguity in the statute—and the congressional grant of authority to the [FDA] on the matter contained within it—provide[d] a 'sound basis,' for giving substantial weight to the [FDA]'s view of the statute." *Id.* at 496, 116 S.Ct. 2240 (citation omitted).

The FDA's regulations concerning § 360k(a) state:

> State or local regulations are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing *divergent State or local requirements applicable to the device different from or in addition to, the specific Food and Drug Administration requirements.* There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not 'requirements applicable to a device' within the meaning of section 521(a) of the act.

21 C.F.R. § 808.1(d) (2006) (emphasis added). The Justices forming the plurality, however, disagreed on whether general state common law torts directed at a Class III medical device could ever amount to "divergent State or local requirements." *Id.*

Justice Stevens, writing for Justices Kennedy, Souter, and Ginsburg, concluded that § 360k(a) only preempted "device-specific enactments of positive law by [state] legislative or administrative bodies, not the application of general rules of common law by [state] judges and juries." *Lohr,* 518 U.S. at 487–88, 116 S.Ct. 2240. Justice O'Connor, however, writing for Justices Rehnquist, Scalia, and Thomas, concluded that general common law torts always amounted to "state requirements" because successful common law causes of action "operate to require manufacturers to comply with common-law duties." *Id.* at 510, 116 S.Ct. 2240 (O'Connor, J., concurring in part and dissenting in part). Therefore, Justice O'Connor believed that § 360k(a) preempted state common-law claims "to the extent that their recognition would impose 'any requirement' different from, or in addition to, [FDA approved] requirements [already] applicable to the device." *Id.* at 512, 116 S.Ct. 2240.

Justice Breyer, concurring in part and concurring in the judgment, essentially agreed with Justice O'Connor's interpretation of "requirement" in § 360k(a).[6] He concluded that "[o]ne can reasonably read the word 'requirement' [in § 360k(a) ] as including the legal requirements that grow out of the application, in particular circumstances, of a State's tort law." *Id.* at 504, 116 S.Ct. 2240 (Breyer, J., concurring in part and concurring in the judgment). To illustrate this point, Justice Breyer set forth the following hypothetical:

> Imagine that, in respect to a particular hearing aid component, a federal MDA regulation requires a 2–inch wire, but a

**6.** When no single rationale commands the agreement of five Justices of the Supreme Court, "the holding may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Justice Breyer's concurrence, therefore, takes on heightened significance in interpreting *Lohr's* holding.

state agency regulation requires a 1-inch wire. If the federal law, embodied in the "2-inch" MDA regulation, preempts the state "1-inch" agency regulation, why would it not similarly pre-empt a state-law tort action that premises liability upon the defendant manufacturer's failure to use a 1-inch wire (say, an award by a jury persuaded by expert testimony that use of a more than 1-inch wire is negligent)? The effects of the state agency regulation and the state tort suit are identical. To distinguish between them for pre-emption purposes would grant great power (to set state standards "different from, or in addition to," federal standards) to a single state jury than to state officials acting through state administrative or legislative lawmaking processes.

*Id.* Therefore, if the "MDA pre-empts a state requirement embodied in a state statute, rule, regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." *Id.* at 504–05, 116 S.Ct. 2240.

The Sixth Circuit Court of Appeals in *Kemp v. Medtronic, Inc.,* 231 F.3d 216 (6th Cir.2000), *cert. denied,* 534 U.S. 818, 122 S.Ct. 48, 151 L.Ed.2d 19 (2001), adopted Justice Breyer's reasoning in *Lohr.* The court held that general state common law tort claims involving Class III medical devices are preempted by § 360k(a) if the device has received FDA approval under the extensive PMA Supplement process. *Id.* at 237. In *Kemp,* the plaintiff's pacemaker—a Class III medical device with PMA Supplement approval—failed to properly regulate the plaintiff's heartbeat. *Id.* at 218–19. Due to the malfunction, the plaintiff fainted and fell on a concrete floor, resulting in serious injury to her skull and temporary "loss of sight, speech, and cognitive and motor ability." *Id.* The

plaintiff alleged strict products liability and negligence, specifically claiming negligence *per se* for failure to comply with FDA standards; fraud on the FDA; and failure to warn. *Id.* at 218, 220.

The Sixth Circuit, focusing on § 360k(a), "translated *Lohr*'s emphasis on the FDA regulations" into a three-part MDA preemption test: "(1) [has] the FDA ... established *specific counterpart regulations* or other specific federal requirements; that are (2) [*specific*] to a particular device; and thus (3) make state regulations *different from, or in addition to,* the specific FDA requirements?" *Id.* at 224 (emphasis added); *see also Cupek v. Medtronic, Inc.,* 405 F.3d 421, 424 (6th Cir.2005) (affirming Kemp's three-part test for MDA preemption).

The court determined that the first and second parts of this preemption test were satisfied by the pacemakers's PMA Supplement approval. Because the PMA and PMA Supplement process employed the same degree of extensive scrutiny, the court concluded that PMA Supplement approval "constitutes [FDA] approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling' [that] is 'specific to the product.' " *Id.* at 226–27 (quoting *Mitchell v. Collagen Corp.,* 126 F.3d 902, 913 (7th Cir.1997)). Therefore, the PMA Supplement process, "taken together with conditions of approval imposed on the device by the FDA," creates "device-specific federal requirements" that include "the information submitted to and approved by the FDA in ... the ... PMA supplement." *Id.* at 227–28 (citing *Martin v. Telectronics Pacing Systems, Inc.,* 105 F.3d 1090 (6th Cir.1997)); *see also Enlow v. St. Jude Med., Inc.,* 171 F.Supp.2d 684, 689 (W.D.Ky.2001); *Isbell v. Medtronic, Inc.,* 97 F.Supp.2d 849, 860–61 (W.D.Tenn.1998).

To determine if the third part of the preemption test was met, the court analyzed each of the plaintiff's general tort claims separately. The court concluded that the strict products liability and negligence claims, if successful, would force the defendant manufacturer to alter the PMA approved design, manufacturing processes, and labels, thus imposing specific state requirements "different from, or in addition to," the specific federal requirements contained in the PMA Supplement. *Id.* at 229, 232, 236 ("A jury verdict in plaintiffs' favor on plaintiffs' negligence per se claims would amount to a state requirement 'different from, or in addition to,' the federal requirements."). Furthermore, the court concluded that the plaintiff's "fraud on the FDA" claim was preempted, stating that the adjudication of the claim would "allow individual juries to undertake a counterfactual FDA review," thus imposing different state requirements. *Id.* at 235–36.

The Sixth Circuit's decision in *Kemp* is heavily reenforced by the FDA'a *amicus curiae* brief submitted in *Horn v. Thoratec Corporation,* 376 F.3d 163 (3d Cir.2004). In *Horn,* the Third Circuit Court of Appeals, applying the three-part MDA preemption test, confirmed that PMA Supplement approval amounts to device-specific federal requirements, and preempted the plaintiff's state common law claims (defective design, manufacturing defect, failure to warn, etc.) due to "severe tension with § 360k(a)." *Id.* at 169, 177. To arrive at this decision, the court relied heavily on the FDA's *amicus curiae* brief, which stated:

> State common law tort actions threaten the statutory framework for the regulation of medical devices, particularly with regard to FDA's review and approval of product labeling. State actions are not characterized by centralized expert evaluation of device regulatory issues. Instead, they encourage, and in fact require, lay judges and juries to second-guess the balancing of benefits and risks of a specific device to their intended patient population—the central role of FDA—sometimes on behalf of a single individual or group of individuals. That individualized redetermination of the benefits and risks of a product can result in relief—including the threat of significant damage awards or penalties—that creates pressure on manufacturers to add warnings that FDA has neither approved, nor found to be scientifically required, or withdrawal of FDA-approved products from the market in conflict with the agency's expert determination that such products are safe and effective. This situation can harm the public health by retarding research and development and by encouraging "defensive labeling" by manufacturers to avoid state liability, resulting in scientifically unsubstantiated warnings and underutilization of beneficial treatments.

Brief for Food and Drug Administration as Amici Curiae Supporting Respondents, *Horn v. Thoratec Corp.,* 376 F.3d 163 (3d Cir.2004) (No. 02–4597), 2004 WL 1143720, at *25–26 (3d Cir. May 14, 2004) (hereinafter "FDA Brief").

In view of the standard established by the Sixth Circuit in *Kemp,* this Court must affirmatively answer two questions for preemption to apply: (1) Is the Medtronic S670D stent subject to device-specific federal requirements under the MDA, and (2) do Plaintiff's Tennessee tort claims impose different or additional specific state requirements?

*(I) Device–Specific Federal Requirements:*

The Medtronic S670D stent, a Class III medical device, was submitted to the FDA on April 23, 1999 under the PMA Supplement process—a process that employs the

same extensive review applicable to an original PMA. *See Isbell,* 97 F.Supp.2d at 851; (Aff. Charles H. Swanson ¶ 21.) The affidavit of Dr. Charles H. Swanson establishes that the S670D's design, testing, manufacturing methods, facilities, controls, materials, and labeling were subject to FDA review. (Aff. Charles Swanson ¶¶ 21–23.) To receive PMA Supplement approval, the Defendant submitted a summary of the coronary stent's safety and effectiveness; device design and manufacturing information; performance standards; technical data, including testing; a bibliography; labeling and warning information; clinical data supporting the safety and effectiveness of the S670D stent; and any additional information the FDA required. 21 C.F.R. § 814.20 (2006); (Aff. Charles Swanson ¶ 21.) Following an extensive review of the Defendant's submitted materials, the FDA, with "reasonable assurance of [the S670D's] safety and effectiveness," approved the S670D for commercial sale on November 23, 1999. § 360c(a)(1)(C); (Aff. Charles Swanson ¶ 21.)

The Plaintiff has failed to offer any evidence that refutes Dr. Swanson's affidavit or challenges the Defendant's assertion that the S670D stent is a Class III medical device that has received PMA Supplement approval. Therefore, this Court concludes that the S670D's PMA Supplement approval "constitutes [FDA] approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling' and is 'specific to the product,'" i.e., the FDA has imposed device-specific federal requirements on the S670D stent. *Kemp,* 231 F.3d at 226–27 (quoting *Mitchell v. Collagen Corp.,* 126 F.3d 902, 913 (7th Cir.1997)).

*(ii) Different or Additional State Requirements:*

Because PMA Supplement approval constitutes federal device-specific safety and effectiveness requirements, § 360k(a) of the MDA must preempt any state common law tort claims that, if successful, would impose different or additional safety and effectiveness requirements. *See Isbell,* 97 F.Supp.2d at 861; *see also Kemp,* 231 F.3d at 228 (stating that "the information submitted to and approved by the FDA in both the ... PMA and as modified by the ... PMA supplement comprise the specific federal requirements"). Section 360k(a), however, does not preempt a state tort claim alleging that a device "defect was the result of the Defendant's failure to comply with the FDA-approved design specifications, manufacturing process, or labeling requirements." *Isbell,* 97 F.Supp.2d at 861 n. 9 (citing *Martin v. Telectronics Pacing Systems, Inc.,* 105 F.3d 1090 (6th Cir.1997).

The Plaintiff argues that her Tennessee tort claims (strict product liability, negligence, breach of express and implied warranties), if successful, would not impose device-specific state requirements on the S670D that are "different from, or in addition to" the specific federal requirements contained in the PMA Supplement approval. Specifically, the Plaintiff argues that her claims merely seek to enforce existing PMA Supplement safety and effectiveness requirements because "[t]here can be no doubt that the FDA would require ... the [S670D's] balloon [to] deflate after deployment of the stent." (Pl. Resp. Mem. Opp'n Mot. Summ. J. 6.) To support this assertion, the Plaintiff offers the affidavits of two physicians, who circumstantially conclude that the S670D was defective because on December 5, 2000, all other operating room equipment appeared to be working properly. (Pl. Resp. Mem. Opp'n Mot. Summ. J. 8–11.) The Plaintiff, however, offers no evidence to support her assertion that the FDA specifically condi-

tioned PMA Supplement approval on the S670D balloon functioning properly, i.e., deflating, every time it was used.

Congress and the FDA have both recognized that Class III medical devices "present a potential unreasonable risk of illness or injury," and are merely "purported or represented to be for use in supporting or sustaining human life." § 360c(a)(1)(C) (2000). The Plaintiff's argument, however, that the S670D balloon was required to always function, i.e. always deflate, fails to account for the "potential unreasonable risk of illness or injury" that accompanies this type of medical device and surgical procedure. Furthermore, the Plaintiff's argument fails to acknowledge that PMA Supplement approval only constitutes approval "of the [S670D's] design, testing, intended use, manufacturing methods, performance standards and labeling' "—not the device's success rate.[7] Id. at 226–27 (quoting Mitchell v. Collagen Corp., 126 F.3d 902, 913 (7th Cir.1997)).

Because the FDA, under PMA Supplement approval, did not specifically require that the S670D balloon always function, i.e. always deflate, the Plaintiff's tort claims, if successful, would impose state specific requirements on the S670D that are "different, or in addition to," the specific PMA Supplement safety and effectiveness requirements approved by the FDA. See § 360c(a)(1)(C); Kemp, 231 F.3d at 228. Therefore, this Court concludes that under MDA § 360k(a), the Plaintiff's Tennessee tort claims are preempted, and Defendant is entitled to judgment as a matter of law.

### B. Genuine Issue of Material Fact:

Alternatively, Defendant has moved for summary judgment on Plaintiff's claims of strict products liability, negligence, and breach of express and implied warranties on the ground that Plaintiff has failed to present evidence creating a genuine issue of material fact under Tennessee statutory and common law. The Court need not discuss the Plaintiff's evidence under Tennessee law in light of its determination that all of Plaintiff's Tennessee tort claims are preempted by 21 U.S.C. § 360k(a) (2000).

### IV. ORDER

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment, finding that the Plaintiff's common law tort claims are preempted by federal law, thus leaving no genuine issues of material fact as to Plaintiff's claim. Therefore, Defendant is entitled to judgment as a matter of law. The clerk is directed to enter judgment accordingly.

---

7. In fact, every case in which a court has held that § 360k(a) of the MDA preempts state common law tort claims has involved a malfunctioning Class III device. See, e.g., Kemp v. Medtronic, Inc., 231 F.3d 216, 218, 237 (6th Cir.2000) (holding that plaintiff's state common law claims were preempted by the MDA despite the fact that the "pacemaker lead [failed] to properly regulate [plaintiff's] heartbeat").